UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NEW ENGLAND DONOR SERVICES, INC., *et al.*,<br><br>        Plaintiffs,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,<br><br>        Defendants. | Civil Action No. 25-4329 (SLS) |

**COMBINED OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND IN SUPPORT OF
DEFENDANTS' CROSS-MOTION FOR SUMMARY
<u>JUDGMENT</u>**

**TABLE OF CONTENTS**

TABLE OF CONTENTS..................................................................................................................... ii
TABLE OF AUTHORITIES ............................................................................................................ iii
INTRODUCTION ............................................................................................................................ iii

BACKGROUND ............................................................................................................................... 3

I. Organ Procurement Organizations ("OPOs") ...................................................................... 3

II. The Recertification Cycle and the Organ Procurement Organization Recertification Act of 2000. ............................................................................................................................... 4

III. The 2006 Process Performance Measures……………………………………………………...8

IV. The Outcome Performance Measures……………………………………………………….9

    A. The 2006 Outcome Performance Measures. ...........................................................................9

    B. The Challenged 2020 Outcome Performance Measures. ..............................................11

V. This Lawsuit ....................................................................................................................... 16

STANDARD OF REVIEW .............................................................................................................. 16

ARGUMENT ................................................................................................................................... 17

I. The OPOs cannot challenge the Final Rule because they have not channeled their claims through the administrative process. ........................................................................................ 17

    A. The Medicare statute expressly requires exhaustion of the OPOs' claims. ....................17

    B. The Certification Act implicitly requires OPOs to exhaust administrative remedies.....21

II. The 2020 Final Rule is well within the confines of statutory authority Congress delegated to the Secretary. .................................................................................................................... 23

III. The 2020 Final Rule's outcome measures are not arbitrary or capricious. ......................... 31

    A. CMS reasonably relied on death certificate data and adequately explained its reasons for doing so..................................................................................................................................31

    B. CMS's decision to consider data from the prior 12 months is reasonable......................32

    C. CMS adequately responded to concerns about factors beyond OPOs' control...............33

    D. CMS sufficiently explained its choice of a 25% threshold for Tier 1 OPOs. .................35

    E. CMS adequately responded to comments about potential consolidation........................36

CONCLUSION................................................................................................................................ 37

# TABLE OF AUTHORITIES

*Adventist Health Sys./SunBelt, Inc. v. HHS*,
17 F.4th 793 (8th Cir. 2021) .................................................................................. 4

*Am. Acad. Of Dermatology v. HHS*,
118 F.3d 1495 (11th Cir. 1997) ............................................................................ 21

*Am. Bioscience Inc. v. Thompson*,
269 F.3d 1077 (D.C. Cir. 2001) ............................................................................ 16

*Ark. Reg'l Organ Procurement Agency v. Shalala*,
104 F. Supp. 2d 1084 (E.D. Ark. 2000) ................................................................ 5

*Batterton v. Francis*,
432 U.S. 416 (1977) ............................................................................................... 23

*Baystate Franklin Med. Ctr. v. Azar*,
950 F.3d 84 (D.C. Cir. 2020) ................................................................................ 17

*Berkley v. Mountain Valley Pipeline, LLC*,
896 F.3d 624 (4th Cir. 2018) ............................................................................ 21-22

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*,
419 U.S. 281 (1974) ............................................................................................... 17

*Children's Hosp. Ass'n of Tex. v. Azar*,
933 F.3d 764 (D.C. Cir. 2019) .............................................................................. 24

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402–14 (1971) ........................................................................................ 16

*City Of Oxford, Ga. v. FAA.*,
428 F.3d 1346 (11th Cir. 2005) ...................................................................... 34, 35

*City of Portland, Or. v. E.P.A.*,
507 F.3d 706 (D.C. Cir. 2007) .............................................................................. 32

*Cmty. Oncology All., Inc. v. Off. Of Mgmt. & Budget*,
987 F.3d 1137–43 (D.C. Cir. 2021) ...................................................................... 19

*Council for Urological Interests v. Sebelius*,
668 F.3d 704 (D.C. Cir. 2011) .............................................................................. 20

*Elgin v. Dep't of the Treasury*,
567 U.S. 1 (2012) ................................................................................................... 22

*FCC v. Nat'l Citizens Comm. For Broad.*,
436 U.S. 775 (1978) ............................................................................................... 17

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) ............................................................................................... 31

*FDA v. Wages & White Lion Invs., LLC,*
  604 U.S. 542 (2025) .................................................................................................. 31

*Golden Triangle, Inc. v. Azar,*
  956 F.3d 689 (5th Cir. 2020) ................................................................................... 24

*Henry Ford Health Sys. v. HHS,*
  654 F.3d 660 (6th Cir. 2011) ................................................................................... 24

*Klock v. Kappos,*
  731 F. Supp. 2d 461 (E.D. Va. 2010) ..................................................................... 16

*Lifestar Ambulance Serv., Inc. v. United States,*
  365 F.3d 1293 (11th Cir. 2004) ............................................................................... 21

*Loper Bright Enters. v. Raimondo*
  603 U.S. 369 (2024) ............................................................................ 16, 23, 24, 28, 29

*Marsh v. Or. Nat. Res. Council,*
  490 U.S. 360 (1989) ........................................................................................... 32, 33

*Marymount Hosp., Inc. v. Shalala,*
  19 F.3d 658 (D.C. Cir. 1994) ................................................................................... 16

*Medicare Act.'" Heckler v. Ringer,*
  466 U.S. 602–15 (1984) .......................................................................................... 18

*Motor Vehicle Mfrs. Ass'n v. State Farm,*
  463 U.S. 29 (1983) .................................................................................................. 31

*Nater-Lebron v. Shalala,*
  120 F. Supp. 2d 175 (D.P.R. 2000) ........................................................................... 5

*National Fed'n of Indep. Bus. v. Sebelius,*
  567 U.S. 519 (2012) ................................................................................................ 30

*Norem v. Lincoln Ben. Life Co.,*
  737 F.3d 1145–50 (7th Cir. 2013) ........................................................................... 28

*North Carolina Ins. Guar. Ass'n v. Becerra,*
  55 F.4th 428–34 (4th Cir. 2022) ............................................................................. 17

*Power Mobility Coal. v. Leavitt,*
  404 F. Supp. 2d 190–203 ........................................................................................ 21

*Shalala v. Ill. Council on Long Term Care, Inc.,*
  529 U.S. 1 (2000) ................................................................................................. 3, 20

*Three Lower Cntys. Comm. Health Servs., Inc. v. HHS,*
  317 F. App'x 1 (D.C. Cir. 2009) .......................................................................... 18, 21

*Thunder Basin Coal Co. v. Reich,*
  510 U.S. 200 (1994) ................................................................................................ 21

iv

*Weinberger v. Salfi,*
    422 U.S. 749–61 (1975) ................................................................................................... 18

**Statutes**

42 U.S.C. § 1320b-8(b)(1)(A)................................................................................... 6, 19, 30

42 U.S.C. § 1320b-8(b)(1)(C)............................................................................................. 5

42 U.S.C. § 1320b-8(b)(1)(F) ............................................................................................ 5

42 U.S.C. § 1320b-8(b)(2) ................................................................................................. 4

42 U.S.C. § 1395 et seq...................................................................................................... 3

42 U.S.C. § 1395ii............................................................................................................ 17

42 U.S.C. § 1395rr(d) ........................................................................................................ 3

42 U.S.C. § 273 ............................................................................................................... 27

42 U.S.C. § 273(b) ....................................................................................................... 4, 24

42 U.S.C. § 273(b)(1)(C) ................................................................................................... 4

42 U.S.C. § 273(b)(1)(D) ............................................................................................. 7, 29

42 U.S.C. § 273(b)(1)(D)(i) ............................................................................................... 7

42 U.S.C. § 273(b)(1)(D)(ii) ...................................................................................... passim

42 U.S.C. § 273(b)(1)(D)(ii)(I) .......................................................................................... 7

42 U.S.C. § 273(b)(1)(D)(ii)(II)............................................................................. 7, 26, 32

42 U.S.C. § 273(b)(1)(D)(ii)(III) ....................................................................................... 7

42 U.S.C. § 273(b)(1)(D)(ii)(IV) ....................................................................................... 7

42 U.S.C. § 273(b)(3) ........................................................................................................ 4

42 U.S.C. § 274a ............................................................................................................. 10

42 U.S.C. § 405(h) ........................................................................................................... 17

Balanced Budget and Emergency Deficit Control Act of 1985................................................. 20

National Organ Transplant Act, Pub. L. No. 98-507, 98 Stat. 2339 (Oct. 19, 1984)................................... 4

Omnibus Budget Reconciliation Act of 1986, Pub. L. 99-509, 100 Stat. 1874 ........................................... 3

Pub. L. 95-292, 92 Stat. 307 (June 13, 1978) ............................................................................ 3

**Other Authorities**

Merriam-Webster's Collegiate Dictionary, 101 (11th ed. 2007) .................................................. 28

Standard, Black's Law Dictionary (12th ed. 2024)................................................................. 27, 28

**Rules**

42 C.F.R. § 486.318............................................................................................... 25, 26, 28

52 Fed. Reg. 28,666 (July 31, 1987)...................................................................................... 3

53 Fed. Reg. 6,526 (Mar. 1, 1988)........................................................................................ 5

59 Fed. Reg. 46,500 (Sept. 8, 1994) ............................................................................... 6

61 Fed. Reg. 19,722 (May 2, 1996) ............................................................................ 5, 27

66 Fed. Reg. 67,109 (Dec. 28, 2001) ........................................................................... 5, 7

70 Fed. Reg. 6,086 (Feb. 4, 2005) ................................................................................... 5

71 Fed. Reg. 30,982 (May 31, 2006) ...................................................................... passim

78 Fed. Reg. 74,826 (Dec. 10, 2013) ............................................................................. 11

84 Fed. Reg. 61,142 (Nov. 12, 2019) ............................................................................. 11

84 Fed. Reg. 70,628 (Dec. 23, 2019) ..................................................................... passim

85 Fed. Reg. 77,898 (Dec. 2, 2020) ....................................................................... passim

89 Fed. Reg. 68,986 (Aug. 28, 2024) ............................................................................ 35

## Regulations

42 C.F.R. § 413.402(b)(9) ............................................................................................... 4

42 C.F.R. § 413.404 ......................................................................................................... 4

42 C.F.R. § 413.404(a)(1) ................................................................................................ 3

42 C.F.R. § 413.420 ......................................................................................................... 4

42 C.F.R. § 486.302 .......................................................................................... 12, 13, 26

42 C.F.R. § 486.303(e) ................................................................................................... 29

42 C.F.R. § 486.303(h) ..................................................................................................... 8

42 C.F.R. § 486.309 ......................................................................................................... 8

42 C.F.R. § 486.314 ......................................................................................................... 8

42 C.F.R. § 486.316(a)(1) .......................................................................................... 14, 30

42 C.F.R. § 486.316(a)(2) ............................................................................................... 15

42 C.F.R. § 486.316(a)(3) ............................................................................................... 15

42 C.F.R. § 486.316(f) .................................................................................................... 28

42 C.F.R. § 486.318(d)(1) ............................................................................................... 12

42 C.F.R. § 486.318(d)(1)(iv) .................................................................................... 12, 26

42 C.F.R. § 486.318(d)(2) ............................................................................................... 13

42 C.F.R. § 486.318(e) .................................................................................................... 14

42 C.F.R. § 486.318(e)(1) ............................................................................................... 14

42 C.F.R. § 486.318(e)(2) ............................................................................................... 14

42 C.F.R. § 486.318(e)(4) ............................................................................................... 14

42 C.F.R. § 486.318(e)(5) ............................................................................................... 15

42 C.F.R. § 486.318(e)(6) ............................................................................................... 15

42 C.F.R. § 486.322 ......................................................................................................... 8

42 C.F.R. § 486.322(a) ..................................................................................................... 8

42 C.F.R. § 486.342 ........................................................................................................................... 9

42 C.F.R. § 486.344 ........................................................................................................................ 8, 9

42 C.F.R. § 486.346(b) ...................................................................................................................... 9

42 C.F.R. § 486.348 ........................................................................................................................... 9

**INTRODUCTION**

Organ donations are a critical component of the United States' healthcare system, but the demand for donated organs far exceeds the supply of donations. There are a significantly higher number of patients waiting for a life-saving organ donation than there are donated organs available for transplant. Congress passed the National Organ Transplant Act of 1984 to create a nationwide organ-transplant system to ensure the procurement, distribution, and transplantation of human organs is conducted in a safe and equitable manner for all potential donors and recipients. Organ procurement organizations ("OPO") are a critical part of that system. These organizations are responsible for identifying potential donors, soliciting donations from those donors, and ensuring that the organs they obtain are safely and quickly delivered to the recipient. In other words, the more efficient and effective the OPO, the more lives are saved.

Congress authorized Medicare and Medicaid to pay OPOs for their costs and took the unusual step of giving each OPO a monopoly over its designated geographic service area. In exchange, Congress expects results. It requires the Secretary of Health & Human Services (the "Secretary"), acting though the Centers for Medicare & Medicaid Services ("CMS" or the "agency"), to recertify that each OPO meets certain minimum standards every four years. As part of that recertification process, Congress expressly delegated authority to the Secretary and CMS to promulgate performance measures that address both the processes OPOs use and the outcomes they achieve. *See* 42 U.S.C. § 273(b)(1)(D)(ii).

With more than a decade of data available, CMS observed that while some OPOs consistently performed well, others languished. The agency therefore promulgated a new set of outcome measures. *See* 85 Fed. Reg. 77,898 (Dec. 2, 2020) (the "2020 Final Rule"). Instead of allowing OPOs to meet only a subset of several complicated outcome measures and sub-measures that relied in part on self-reported data, the Final Rule requires the agency to evaluate all OPOs

using two streamlined measures based on objectively verifiable data: (1) the "donation rate," which measures an OPO's success at acquiring organ donors from their service area; and (2) the "transplantation rate" which measures an OPO's success at procuring organs that are ultimately transplanted from donors in their service area.

To incentivize each OPO to achieve the best possible outcomes, the Secretary evaluates the OPO's performance based on a tier system. Top-performing OPOs are placed in Tier 1 and recertified if they also meet the Secretary's process requirements. Those OPOs keep their monopoly over their service area. Middling OPOs are placed in Tier 2 and must show that they are still the best OPO to keep their monopoly over their service area. Low-performing OPOs are placed in Tier 3 and decertified, after which other OPOs compete for the opportunity to take over their service areas. The Secretary calculates the threshold for each tier based on how OPOs performed the prior year. And he assigns OPOs to each tier based on whether their performance for the relevant year is statistically at least as good as the threshold. That means that all OPOs can achieve Tier 1 status each year, and the system incentivizes OPOs to achieve statistically comparable outcomes to the best OPOs.

Now, on the eve of the rule's implementation and five years after its promulgation, four OPOs have sued, asking this Court to vacate and set aside the outcome measures set forth in the Final Rule under the Administrative Procedure Act ("APA"). The OPOs argue that CMS lacks the statutory authority to promulgate the Final Rule's outcome measures, that those measures are arbitrary and capricious, and that CMS failed to adequately engage with the public comments. These arguments all boil down to a complaint that the outcome measures are unfair because they will hold OPOs accountable. But that is exactly what Congress envisioned when it required CMS to evaluate OPOs' performance using real-world data. In the end, CMS reasonably exercised the

2

broad authority Congress delegated to the agency to test each OPO's performance, and its regulation should be upheld.

However, the Court need not decide these issues in the abstract because the OPOs must first exhaust their administrative remedies before bringing this challenge. Congress requires Medicare participants to seek review of regulations governing Medicare eligibility only after first channeling those claims to the agency through its administrative adjudicatory process. *See Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 25 (2000). This Court should therefore reject this premature challenge—presented in the abstract and without the challenging OPO's even knowing whether they will actually face de-certification under the Final Rule's outcome measures—and grant CMS's cross-motion for summary judgment.

## BACKGROUND

### I. Organ Procurement Organizations ("OPOs")

Medicare is a nationwide, federally funded health insurance program for the elderly, disabled, and patients suffering from end-stage renal disease. *See* 42 U.S.C. § 1395 *et seq.* Medicare generally pays for the costs of acquiring and transplanting organs for Medicare recipients, regardless of whether the donor is enrolled in Medicare. *See* 42 C.F.R. § 413.404(a)(1). Payments began in the 1970s, when Medicare began covering patients with end-stage renal disease and became the primary payer nationwide for kidney transplants. *See* Pub. L. 95-292 § 2, 92 Stat. 307, 313 (June 13, 1978) (as codified and amended at 42 U.S.C. § 1395rr(d)); *see* 52 Fed. Reg. 28,666, 28,666 (July 31, 1987) ("Medicare is the primary payer for almost all kidney transplant procedures."). Congress eventually expanded coverage to other organ transplants. *See* Omnibus Budget Reconciliation Act of 1986, Pub. L. 99-509 § 9318, 100 Stat. 1874, 2009 (codified 42 U.S.C. § 1320b-8).

While hospitals operate on deceased patients to remove organs, organ transplantation involves many steps outside of surgery that hospitals cannot handle. Prospective donors must be identified, donated organs need to be matched to eligible recipients, and once matched— potentially at a distant hospital—the organs require timely and specialized transportation.

In order to help "reduce chronic shortages of donated organs urgently needed by patients awaiting transplants," *Adventist Health Sys./SunBelt, Inc. v. HHS*, 17 F.4th 793, 796 (8th Cir. 2021), Congress entrusted the responsibility of procuring organs for transplant to a national network of nonprofits, called organ procurement organizations or simply OPOs. *See* National Organ Transplant Act, Pub. L. No. 98-507 § 201, 98 Stat. 2339, 2343−44 (Oct. 19, 1984) (codified as amended at 42 U.S.C. § 273(b)). Congress charged these organizations with leading efforts to "acquire all useable organs from potential donors," "arrange for the acquisition and preservation of donated organs," and coordinate or provide for "the transportation of donated organs to transplant centers." 42 U.S.C. § 273(b)(3)(B), (C), (F).

Each OPO is granted a monopoly over organ procurement activities in an assigned donation service area. *See* 42 U.S.C. § 1320b-8(b)(2). Medicare reimburses OPOs directly for their reasonable costs to procure kidneys. *See id.* § 273(b)(1)(C); 42 C.F.R. § 413.420. It pays OPOs indirectly for the costs of procuring other organs by reimbursing hospitals for qualifying payments to OPOs. *See* 42 U.S.C. § 1320b-8(b)(1). OPOs bill transplant hospitals their standard acquisition cost to procure the relevant organ, *see* 42 C.F.R. § 413.404(a)(3), (c), and hospitals submit those costs to Medicare for reimbursement, *see id.* § 413.402(b)(9).

## II.   The Recertification Cycle and the Organ Procurement Organization Recertification Act of 2000.

"OPO performance is one of the most critical elements of the nation's organ transplantation system." 70 Fed. Reg. 6,086, 6,087 (Feb. 4, 2005). An organization "that is effective in procuring

organs and delivering them safely to transplant centers will save more lives than an ineffective OPO." *Id.* Congress thus limits Medicare and Medicaid payments only to OPOs that the Secretary has recently certified or recertified as "meet[ing] performance-related standards prescribed by the Secretary" and is "designated" by the Secretary as the OPO eligible for payments in a service area. 42 U.S.C. § 1320b-8(b)(1)(C), (F). Those performance standards are dynamic. The Secretary "review[s] and revise[s] them periodically as conditions and changes in organ procurement dictate." 53 Fed. Reg. 6,526, 6,538−39 (Mar. 1, 1988).

To evaluate OPOs in 2000, the agency used performance measures the Secretary published in 1996. Under those standards, each OPO needed to "achieve at least 75 percent of the national mean for four of . . . five performance categories, averaged over the 2 calendar years before the year of redesignation." 61 Fed. Reg. 19,722, 19,744 (May 2, 1996) (then-codified at 42 C.F.R. § 486.310(b)). Those categories compared the number of donors, organs recovered, and organs transplanted, to the service area's population in various ways. *Id.*

The agency found that 56 of the then-59 OPOs met those measures. *See* 66 Fed. Reg. 67,109, 67,109 (Dec. 28, 2001) (describing recertification). OPOs sued, and district courts diverged over whether the measures were arbitrary and capricious. *Compare Ark. Reg'l Organ Procurement Agency v. Shalala*, 104 F. Supp. 2d 1084 (E.D. Ark. 2000) (granting summary judgment to OPO) *vacated*, No. 00-3146 (8th Cir. Dec. 11, 2000) *with Nater-Lebron v. Shalala*, 120 F. Supp. 2d 175 (D.P.R. 2000) (rejecting challenge) *appeal dismissed*, No. 00-2467 (1st Cir. Dec. 11, 2000).

While the litigation was pending, Congress enacted the "Organ Procurement Organization Certification Act of 2000." Pub. L. No. 106-505, Title VII, 114 Stat. 2314, 2346–48 (Nov. 13, 2000) (the "Certification Act").  It found that aspects of the certification and recertification process

had "created a level of uncertainty that is interfering with the effectiveness of organ procurement organizations in raising the level of organ donation." *Id.* § 701(b)(2), 144 Stat. at 2346 (codified at 42 U.S.C. § 273 note). Congress found that one of the "limitations in the recertification process" was "exclusive reliance on population-based measures of performance that do not account for the potential in the population for organ donation and do not permit consideration of other outcome and process standards that would more accurately reflect the relative capability and performance of each organ procurement organization." *Id.* § 701(b)(4)(A), 144 Stat. at 2346.

Congress also identified a second limitation: "[a] lack of due process to appeal to the Secretary of Health and Human Services for recertification on either substantive or procedural grounds." *Id.* § 701(b)(4)(B), 144 Stat. at 2346. At the time, OPOs used the same administrative appeal process as other Medicare participants challenging a decertification. *See* 59 Fed. Reg. 46,500, 46,517 (Sept. 8, 1994) ("The OPO may appeal the termination in accordance with the provisions set forth in part 498.") (then-codified at 42 C.F.R. § 486.311(c)). But at the time, the Secretary required all re-certified OPOs to compete for all service areas. *Id.* ("A service area is open for competition once the existing designation period has expired.") (then-codified at 42 C.F.R. § 486.308). And while the statute authorized the Secretary to allow a certification to be valid for four years if "appropriate for an organization on the basis of its past practices," the default rule was that OPOs needed to be recertified every two years. *See* 42 U.S.C. § 1320b-8(b)(1)(A). That meant there was no time to allow a decertified OPO to complete the administrative appeals process before the agency needed to begin the competition process for the service area. *See* 71 Fed. Reg. 30,982, 30,992 (May 31, 2006) (estimating appeals took more than seven months). That led to disruptions when OPOs that the agency sought to decertify sought preliminary relief from

courts to prevent other OPOs from taking over their service area during their appeal. *See id.* at 30,992−93.

To address these issues, Congress enacted 42 U.S.C. § 273(b)(1)(D). Pub. L. 106-505 § 701(c)(3), 144 Stat. at 2347. First, Congress mooted the pending litigation by temporarily recertifying all then-existing OPOs. *See* 42 U.S.C. § 273(b)(1)(D)(i). It then directed the Secretary to take advantage of that extended period to promulgate a new "process" that "is defined through regulations that are promulgated by the Secretary" to certify or recertify an OPOs' compliance with his performance standards. *Id.* § 273(b)(1)(D)(ii). To address its substantive concerns, Congress required that the process "rely on outcome and process performance measures that are based on empirical evidence, obtained through reasonable efforts, of organ donation potential and other related factors in each service area[.]" *Id.* § 273(b)(1)(D)(ii)(II). And any certification process must "use multiple outcome measures." *Id.* § 273(b)(1)(D)(ii)(III).

To address its procedural concerns, Congress required the process provide for recertification "not more frequently than once every 4 years," *id.* § 273(b)(1)(D)(ii)(I) and "provide for a qualified organ procurement organization to appeal a decertification to the Secretary on substantive and procedural grounds," *id.* § 273(b)(1)(D)(ii)(IV). In other words, the statute envisioned "a more streamlined, sequential process" in which a decertified OPO's appeal would be decided before other OPOs could compete for its service area, helping "to reduce the uncertainty in the recertification process." 71 Fed. Reg. at 30,992.

To give the Secretary more time to consider the relevant data, the agency recertified existing OPOs through 2006. 66 Fed. Reg. at 67,109. The Secretary promulgated that new process in 2006. *See* 71 Fed. Reg. at 30,982. It required that OPOs "[m]eet the conditions for coverage for organ procurement organizations, which include both outcome and process performance

7

measures," *see* 42 C.F.R. § 486.303(h), described below. It also included a streamlined appeals process, *see id.* § 486.314, which the Secretary explained would allow an OPO to complete its administrative appeal before the competition process began, *see* 71 Fed. Reg. at 30,995 (detailing anticipated timing). The Secretary then recertified all OPOs for an additional four years to give them time to adjust to the new requirements. *See* 42 C.F.R. § 486.309 (extending recertifications through 2010).

### III.    The 2006 Process Performance Measures

In the 2006 rulemaking, the Secretary established process performance measures spanning ten separate sections of the Code of Federal Regulations. *See* 71 Fed. Reg. at 31,051−54 (codified at 42 C.F.R. §§ 486.320−348). These process measures include:

- **Process to Define Hospital Relationships** – OPOs must agree in writing with 95% of qualifying hospitals in their service areas on their respective responsibilities, including agreeing on what constitutes "imminent death" and when a hospital has made a "timely referral." *See* 42 C.F.R. § 486.322(a). Additionally, OPOs must collaborate with transplant programs on protocols defining OPO and transplant hospital roles and responsibilities for donor evaluation, donor management, organ recovery, and organ placement. *Id.* § 486.344(d).

- **Process to Cooperate with Tissue Banks** – OPOs must cooperate with tissue banks on screening and referral of potential tissue donors, obtaining informed consent from families of potential tissue donors, handling tissue at various stages of the organ donation process, and providing training. *See id.* § 486.322(c).

- **Process to Obtain Donor Consent –** OPOs must have a written protocol to obtain informed consent for organ donation that must include providing a list of information to those responsible for making donation decisions. *See id.* § 486.342.

- **Process to Evaluate Potential Donors** – OPOs must follow specific steps to evaluate potential donors, including verifying the donor's death under relevant laws, conducting a physical examination of the donor, reviewing the potential donor's medical chart, screening the potential donor for infectious diseases using a certified laboratory, typing the donor's blood with two separate blood samples, and comparing that type with the intended recipient's type. *See id.* § 486.344.

- **Process to Transport Organs** – When transporting organs, OPOs must send to the transplant center particular documentation specified by the regulation. While some of that documentation may be sent electronically, some of it must be physically printed and sent in a watertight container. *See id.* § 486.346(b)(1)−(3). Two separate people must verify the accuracy of the information, one of whom must be an OPO employee. *Id.* § 486.346(b)(4).

- **Quality Assessment and Performance Improvement Process** – OPOs must establish a comprehensive and data-driven quality assessment program designed to monitor and evaluate performance of all donation services. As part of that program, OPOs must review every month the death records in qualifying hospitals to identify missed organ donation opportunities. *See id.* § 486.348.

These process performance measures have remained unchallenged and largely unchanged since 2006.

IV.    The Outcome Performance Measures

A.  The 2006 Outcome Performance Measures.

In its 2006 rulemaking implementing the Certification Act, the Secretary initially required OPOs to meet three outcome performance measures:

**1. Donation Rate** – The Secretary first measured donation rate, which he defined as eligible donors as a percentage of eligible deaths in a service area. *See* 71 Fed. Reg. at 31,050 (then-codified at 42 C.F.R. § 486.318(a)(1)). The Secretary did not require OPOs to meet a particular numeric donation rate. Instead, to meet this measure, an OPO's donation rate could not fall more than 1.5 standard deviations below the national mean. *See id.*

**2. Expected Donation Rate** – The second measure compared an OPOs' observed donation rate to its expected donation rate, which the agency calculated using a complex formula derived by the Scientific Registry of Transplant Recipients, a statistical body created by statute to assist the Secretary with "ongoing evaluation of the scientific and clinical status of organ transplantation." 42 U.S.C. § 274a; *see* 71 Fed. Reg. at 31,050 (then-codified at 42 C.F.R. § 486.318(a)(2)); *see also id.* at 31,002. The observed rate could not be "significantly below" the expected rate for more than 18 months in the recertification cycle. *Id.* Significance referred to statistical significance. That is, when, applying standard statistical tools, there needed to be more than a 95-percent chance the variance between the rates was explained by "genuine difference" rather than "random chance." *Id.* at 31,003.

**3. Organ Yield** – The Secretary also analyzed three "yield" measures: (i) the number of organs transplanted per standard donor, (ii) the number of organs transplanted per an "expanded" donor definition, as updated by the Scientific Registry of Transplant Recipients and another transplant entity, *see id.* at 30,985, and (iii) the number of organs used for research per donor. Two

10

out of three of the yield measures could not fall more than 1.5 standard deviations below the national mean. *Id.* at 31,050–51 (then-codified at 42 C.F.R. § 486.318(a)(2)).

Responding to concerns over these measures, the Secretary later decreased the number of performance measures OPOs would need to meet from three to two. *See* 78 Fed. Reg. 74,826, 75,144 (Dec. 10, 2013) (amending 42 C.F.R. § 483.318 "to require that OPOs must meet two out of the three outcome measures instead of all three outcome measures"). OPOs continued to have concerns about the expected-donation-rate measure, and the Secretary eventually realized that his regulations had not kept up with the Scientific Registry of Transplant Recipients' methodology. The Secretary thus allowed OPOs to meet only one of the donation-rate and organ-yield measures during the 2022 recertification cycle. *See* 84 Fed. Reg. 61,142, 61,434–35 (Nov. 12, 2019) (then-codified at 42 C.F.R. § 483.318(e)).

### B.  The Challenged 2020 Outcome Performance Measures.

By 2019, the Secretary acknowledged that his 2006 outcome measures could be improved. *See* 84 Fed. Reg. 70,628, 70,628 (Dec. 23, 2019) (proposed rule). He cited concerns from advocacy organizations that "'[p]erformance varies across the OPO network,'" with some OPOs becoming a "bottleneck within the system" that increased avoidable deaths. *Id.* (quoting RR-02997, -03039). And the Secretary identified concerns that "the current outcome measures are not reliable and transparent indicators of OPO performance." *Id.* at 70,630. For example, the Secretary cited criticisms from a large OPO that the donation-rate metric depended on the number of "eligible deaths" in a service area, which was derived entirely from unaudited data self-reported by OPOs, leading to inconsistent interpretations. *Id.* (citing RR-03171). Other stakeholders observed that aspects of the donation yield metric "'drives OPOs to walk away from cases in which the donor only has one organ viable for transplant,'" meaning that "potentially transplantable organs may be wasted, exacerbating the organ shortage problem." *Id.* (quoting RR-03039).

11

After notice and comment, the Secretary promulgated a rule amending the agency's outcome performance measures. *See* 85 Fed. Reg. at 77,898. First, he replaced his three prior measures with two: (1) donation rate and (2) organ transplantation rate:

**1. Donation Rate** – The Secretary retained a donation-rate metric, but changed the data the agency uses to measure that rate. *See* 42 C.F.R. § 486.318(d)(1). While the agency previously counted as donors anyone from whom an organ was "recovered," the new metric defined donors as patients from whom "at least one vascularized organ . . . is transplanted." 85 Fed. Reg. at 77,903 (codified at 42 C.F.R. § 486.302 (defining "donor")). The Secretary explained that doing so would "discourage the discarding of procured organs," "encourage transplantation of every organ, including those from single-organ donors," and avoid verification difficulties for donors who never had an organ transplanted. 84 Fed. Reg. at 70,631.

The Secretary also changed the denominator of the donation-rate metric. The agency would no longer look to the number of donors per "eligible death," with all the associated problems of self-reported and unaudited data. Instead, the agency would look to "donor potential," defined by deaths "with a primary cause of death that is consistent with organ donation." *See* 42 C.F.R. § 486.318(d)(1)(iv). Under the new approach, the agency could utilize the "primary cause of death" identified on standardized death-certificate data from the U.S. Centers for Disease Control and Prevention to determine the total donor potential for a particular OPO's geographic region. 85 Fed. Reg. at 77,906. The Secretary acknowledged comments pointing out that there may be errors on death certificates, but explained that those errors are generally from random "user error" that would not "disadvantage one [service area] over another" and thus skew the data. *Id.* He explained that no commenter pointed to better empirical sources, and cited a peer-reviewed study identifying

death certificate data as "the most complete information that is readily and publicly available, that can be used for estimating the donor potential at this time." *Id.* (citing RR-2005−10).

**2. Transplant Rate** – Second, the Secretary promulgated a transplantation rate measure that looks at the total number of organs transplanted compared to donor potential, *see* 42 C.F.R. § 486.318(d)(2), and so "directly measures the benefit for patients from OPO performance," 85 Fed. Reg. at 77,905. The Secretary agreed with comments that this purely "volumetric" measure would address a concern that the expected donor rate measure did not always reflect improvement in on-the-ground transplantation rates. *See id.* at 77,903−04; *see also* RR-01406 (OPO comment describing that measure declined even as OPO improved lung transplantation).

In response to comments, the Secretary agreed to risk-adjust the transplant rate based on the average age of potential donors. *See* 42 C.F.R. § 486.302 (defining "organ transplantation rate" to account for age). He explained that the "average age of the donor potential correlated with performance on the organ transplantation rate." 85 Fed. Reg. at 77,910. In other words, one might expect higher transplantation rates from younger donors who often have fewer health complications than older donors. Thus, the Secretary promulgated a methodology (unchallenged here) that calculates an expected transplantation rate for each OPO based on the age of their potential organ donors and uses that expected transplantation rate to calculate an "age-adjusted organ transplantation rate" for the OPO. *Id.* at 77,910.

The Secretary acknowledged that donation and transplantation rates "are somewhat correlated because if there are more donors, there are likely to be more organs transplanted," 85 Fed. Reg. at 77,905, but explained that they measure different things and work together to incentivize all OPOs to maximize organ donations in their service areas. He explained that "OPOs that focus primarily on" difficult cases might have a good donation rate, but "may need to seek

13

more donations in order to have sufficient organs transplanted to mathematically meet the organ transplantation rates." 85 Fed. Reg. at 77,905. Other OPOs that prioritize "placing all possible organs from younger, healthier donors may achieve the targeted organ transplantation rate," but might struggle to achieve the donation rate unless they pursue more complex cases "with only one or two transplantable organs." *Id.* In other words, by including both metrics, the Secretary would "incentivize OPOs to pursue all donors." *Id.* at 77,903.

Together the Secretary explained, the measures would measure success at both "obtaining donors" and "placing as many organs as possible," "capture virtually the entire pool of possible donors" and "adjust for the geographic differences in the number and causes of death"—key shortcomings of the prior measures. *Id.* at 77,928−29. And each is a "workable performance standard that exhibits uniformity, timeliness, and stability year-to-year." *Id.* at 77,929.

Finally, the Secretary changed how the agency determines minimum acceptable performance on the outcome standards. Instead of requiring that an OPO not fall too far below the median rate, the agency calculates performance thresholds for three "tiers." *See* 42 C.F.R. § 486.318(e). The agency derives the performance thresholds for each year based on the donation rates and transplant rates that OPOs achieved the preceding year. *Id.* § 486.318(e)(1)−(2). The agency then places OPOs whose donation rates and organ transplantation are statistically significantly below each threshold in the associated tier:

**1. Tier 1** – The agency derives the Tier 1 threshold from the donation and transplant rates of the top 25% of OPOs in the prior year. *Id.* § 486.318(e)(4). OPOs whose donation and transplant rates are not statistically significantly below that threshold are assigned to Tier 1. *Id.* An OPO assigned to Tier 1 in a recertification year that also meets the Secretary's process measures is recertified and keeps its designated service area for the next four years. *Id.* § 486.316(a)(1).

**2. Tier 2** – The agency derives the Tier 2 threshold from the median donation and transplant rate of OPOs in the prior year. *Id.* § 486.318(e)(5). OPOs whose donation and transplant rates are above the median, with one (but not both) of those measures above the Tier 1 threshold, are assigned to Tier 2. *Id.* An OPO assigned to Tier 2 in a recertification year that also meets the Secretary's process metrics must compete with other OPOs to show that it is the best OPO for its current service area, *id.* § 486.316(a)(2), similar to the pre-2006 process for all OPOs.

**3. Tier 3** – OPOs whose donation or transplant rates are statistically below the median OPO's in the prior year are assigned to Tier 3. *Id.* § 486.318(e)(6). An OPO assigned to Tier 3 in a recertification year or that fails the Secretary's process metrics is decertified. *Id.* § 486.316(a)(3).

CMS uses the most recent OPO data to measure performance, but there is some lag based on data availability. For 2026 recertifications, CMS will evaluate OPOs based on their 2024 performance data based on thresholds using OPOs' 2023 performance data. *See* 85 Fed. Reg. at 77,916. As an example, CMS generated in 2025 the thresholds for the OPOs' 2023 performance based on how OPOs performed in 2022. To qualify for Tier 1, an OPO's 2023 donation rate (that is, the number of donors divided by the donor potential) could not be statistically significantly below 14.11, and its 2023 transplant rate (that is, organs transplanted divided by the donor potential) could not be statistically significantly below 45.67. To qualify for Tier 2, an OPO could not qualify for Tier 1, its 2023 donation rate could not be statistically significantly below 12.49, and its transplant rate could not be statistically significantly below 38.56.[1]

---

[1]     Data from this example is derived from the OPO public performance reports available at qcor.cms.gov, specifically the "2025 Assessment" tab in chart the following link: https://view.officeapps.live.com/op/view.aspx?src=https%3A%2F%2Fqcor.cms.gov%2Fdocume nts%2FPublic%25202024%2520%26%25202025%2520OPO%2520Report%2520- %2520July%25202025.xlsx&wd.

### V.    This Lawsuit

More than five years after CMS promulgated the 2020 Final Rule, the plaintiff OPOs sued. The OPOs allege that the outcome performance measures in the 2020 Final Rule violate various provisions of the Certification Act and the APA. Am. Compl. ¶¶ 128–163, ECF No. 14. They have moved for summary judgment, seeking to vacate the 2020 Final Rule. Compl. at 47 (Prayer for Relief); Pls' Mot. for Summ. J. 1, ECF No. 15.

**STANDARD OF REVIEW**

In a challenge to agency rulemaking brought under the APA, the "entire case on review is a question of law" and the district court therefore "sits as an appellate tribunal." *Klock v. Kappos*, 731 F. Supp. 2d 461, 465 (E.D. Va. 2010) (quoting *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009)); *see also Am. Bioscience Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). The "contours of judicial review" of this action are governed by the APA. *Loper Bright Enters. v. Raimondo,* 603 U.S. 369, 391 (2024). In the recent *Loper Bright* decision, the Supreme Court emphasized that, unlike matters of statutory interpretation covered by the erstwhile Chevron doctrine, "Section 706 of the APA does mandate that judicial review of agency policymaking and factfinding be deferential." *Loper Bright*, 603 U.S. at 392. *Loper Bright* emphasized that a Court may only set aside the Secretary's determination if it is "arbitrary, capricious, an abuse of discretion, otherwise not in accordance with the law," or "unsupported by substantial evidence . . . reviewed on the record of an agency hearing provided by statute." 5 U.S.C. § 706; *Loper Bright*, 603 U.S. at 392 (citing 5 U.S.C. §§ 706(2)(A), 706(2)(E)); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–14 (1971); *Marymount Hosp., Inc. v. Shalala*, 19 F.3d 658, 661 (D.C. Cir. 1994).

Agency action is not arbitrary and capricious unless it is based on an unlawful interpretation of the statute or regulations or is "not rational and based on consideration of the

16

relevant factors." *FCC v. Nat'l Citizens Comm. For Broad.*, 436 U.S. 775, 803 (1978). "The scope of review under the 'arbitrary and capricious' standard is narrow," and a reviewing tribunal "should not substitute its judgment for that of the agency." *See Baystate Franklin Med. Ctr. v. Azar*, 950 F.3d 84, 89 (D.C. Cir. 2020) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Even if the agency's decision is one of "less than ideal clarity," a tribunal may uphold it "if the agency's path may be reasonably discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 290 (1974).

## ARGUMENT

I.     **The OPOs cannot challenge the Final Rule because they have not channeled their claims through the administrative process.**

The OPOs' lawsuit constitutes a facial pre-enforcement challenge to the 2020 Final Rule, relying on 28 U.S.C. § 1331. Am. Compl. ¶ 15. That challenge is premature under (A) the Medicare statute and (B) the Certification Act.

### A. The Medicare statute expressly requires exhaustion of the OPOs' claims.

The Medicare statute precludes federal-question jurisdiction over claims that "arise under" that statute, requiring plaintiffs to channel their claims through the agency's administrative adjudicatory process. 42 U.S.C. § 1395ii (incorporating 42 U.S.C. § 405(h)). Under § 405(h), as incorporated into the Medicare statute by § 1395ii, "[n]o action against the United States . . . or any officer or employee thereof shall be brought under section 1331 . . . of Title 28 to recover on any claims arising under" the Medicare statute. *See North Carolina Ins. Guar. Ass'n v. Becerra*, 55 F.4th 428, 433–34 (4th Cir. 2022). The Supreme Court has construed those provisions to "channel[] most, if not all, Medicare claims" through the agency's administrative review procedures. *Ill. Council on Long Term Care,* 529 U.S. at 8. The Court there held that the

administrative review process "is the sole avenue for judicial review for all 'claim[s] arising under the Medicare Act.'" *Heckler v. Ringer*, 466 U.S. 602, 614–15 (1984) (alteration in original).

The Supreme Court has interpreted § 405(h) broadly. In *Illinois Council*, the Court held that district courts lacked jurisdiction to hear a pre-enforcement challenge to new regulations governing nursing homes because the challenge "conteste[d] the imposition of a penalty by the agency" in advance, which amounted to an action "to recover on any claim arising under" the Medicare statute and was therefore barred by § 405(h). 529 U.S. at 10. Like "[c]laims for monetary benefits," the Supreme Court explained, "claims of program eligibility[] and claims that contest a sanction or remedy may all similarly rest upon individual fact-related circumstances, may all similarly dispute agency policy determinations, or may all similarly involve the application, interpretation, or constitutionality of interrelated regulations or statutory provisions." *Id.* at 14.

In response, the OPOs argue that Medicare's channeling requirement does not apply to their lawsuit as "no part of the complaint . . . cites to any portion of" the Medicare Act. Mem. of Law in Support of Pls' Mot. for Summ. J. ("Pls' Mot.") at 17, ECF No. 15-1 (emphasis omitted). Instead, it says that its claim arises under the Public Health Services Act. *Id*. But the OPOs cannot avoid the channeling requirement simply by invoking the Public Health Services Act. Indeed, the D.C. Circuit has expressly rejected that argument. *Three Lower Cntys. Comm. Health Servs., Inc. v. HHS*, 317 F. App'x 1, 2 (D.C. Cir. 2009). The requirement applies if Medicare provides "the standing and the substantive basis for the presentation of" the OPOs' claims. *See Ill. Council on Long Term Care, Inc.*, 529 U.S. at 11 (internal quotation marks omitted) (channeling claims arising under the APA and Constitution); *Heckler*, 466 U.S. at 621–22 (claims "arise[] under" the Medicare statute when they involve a "claim for future benefits"); *see also Weinberger v. Salfi*, 422 U.S. 749, 760–61 (1975) (claims alleging only violations of the Constitution nevertheless also

18

"arise[] under" the Social Security Act for purposes of § 405(h)). And in this case, the Medicare statute unquestionably provides the "standing and substantive basis" for the OPOs' claims.

Here, Medicare provides the standing and substance of the OPOs' claims. Their lawsuit seeks to challenge under § 1331 the performance standards that OPOs must satisfy to be eligible to receive Medicare payments or to be a designated OPO for a particular service area. *See* 42 U.S.C. § 1320b-8(b)(1)(C), (F) (conditioning OPO eligibility for Medicare payments on it meeting the Secretary's "performance-related standards" and requiring "designat[ion] by the Secretary); *see also* 85 Fed. Reg. at 77,899 ("OPOs must meet these requirements in order to be able to receive payments from the Medicare . . . program[.]"). The OPOs concede that their standing to bring this lawsuit comes from the possibility that they will be decertified and therefore no longer eligible to receive Medicare payments. Pl's Mot. at 15 (arguing that if they are decertified, they would be harmed because they would be deprived "of all ability to work with any hospital that wishes to receive federal funding"). Whether a "claim[] of program eligibility" to Medicare or a "claim[] that contest[s] [the] sanction or remedy" of decertification or reassignment, § 405(h) requires the OPOs to avail themselves of the administrative process before challenging those standards. *Ill. Council*, 529 U.S. at 14.

The cases the OPOs rely on do not suggest otherwise. For example, in *National Infusion Center v. Becerra*, the Fifth Circuit agreed that the channeling requirement applied to claims for Medicare eligibility even if the legal issue "turned on the interpretation of a provision of the Affordable Care Act" and not a provision of the Medicare statute itself. 116 F.4th 488, 506 (5th Cir. 2024); *see also Cmty. Oncology All., Inc. v. Off. Of Mgmt. & Budget*, 987 F.3d 1137, 1142–43 (D.C. Cir. 2021) (holding that the channeling requirement applied to a claim brought under the Balanced Budget and Emergency Deficit Control Act of 1985).

The OPOs argue that the narrow exception to the channeling requirement applies here because it will not be able to raise its challenge to the validity of the 2020 Final Rule through the administrative process and because there is no administrative process available to Tier 2 OPOs. Pls' Mot. at 17–18 (quoting *Ill. Council on Long Term Care,* 529 U.S. at 19). There is an exception to the channeling requirement in which "application of § 405(h) would not simply channel review through the agency, but would mean no review at all." *Ill. Council on Long Term Care,* 529 U.S. at 19. But that exception applies only where the channeling requirement would effectively mean there is no avenue to judicial review of "a particular *claim*" for the general class of plaintiffs. *Council for Urological Interests v. Sebelius*, 668 F.3d 704, 711 (D.C. Cir. 2011).

Here the class of plaintiffs—OPOs—have a clear path to judicial review of their facial challenge to the 2020 Final Rule, including the validity of the rule's provisions that open up Tier 2 OPOs' service areas to competition without decertifying the OPO. CMS's regulations grant administrative review over decisions to decertify an OPO under the procedures outlined at 42 C.F.R. § 486.314. At the end of that process, an OPO that receives an adverse decision from the hearing officer can challenge that decision under the APA's judicial-review provisions. *See* 5 U.S.C. § 704; 42 C.F.R. § 486.314(i). Thus, any plaintiff OPO that receives a Tier 3 ranking will receive a notice of decertification, 42 C.F.R. § 486.314, at which point it can challenge the validity of the 2020 Final Rule, including the Tier 2 provisions, through those administrative proceedings and subsequent judicial review.

That remains true even if CMS does not afford hearing officers the authority to rule on the validity of the 2020 Final Rule or if only Tier 3 OPOs, and not Tier 2 OPOs, can avail themselves of the administrative process. *See Ill. Council on Long Term Care,* 529 U.S. at 23 ("The fact that the agency might not provide a hearing for that *particular contention*, or may lack the power to

20

provide one . . . is beside the point because it is the 'action' arising under the Medicare Act that must be channeled through the agency." (internal citations omitted)); *see also Three Lower Cntys. Comm. Health Servs.,* 317 F. App'x at 2 (rejecting argument that providers have no meaningful judicial review of payment methodologies because the administrative tribunals cannot depart from those methodologies because the providers could challenge those methodologies at the judicial review stage); *Power Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190, 202–203.

"*Ringer* and *Illinois Council* make clear that the fact that an agency's administrative review, by itself, might not afford the relief claimed, does not excuse the jurisdictional requirements of presentment and exhaustion of administrative remedies" imposed by § 405(h). *Lifestar Ambulance Serv., Inc. v. United States*, 365 F.3d 1293, 1298 (11th Cir. 2004); *see Am. Acad. Of Dermatology v. HHS*, 118 F.3d 1495, 1499 (11th Cir. 1997) ("[T]he requirements of presentment and exhaustion must be met prior to the exercise of judicial review."). The exception to the channeling requirement therefore does not apply where the administrative tribunal lacks authority to decide a particular claim, as long as there is a pathway to judicial review before an Article III court that does have authority to decide the claim. *Power Mobility Coal.*, 404 F. Supp. 2d at 202.

> ### B. The Certification Act implicitly requires OPOs to exhaust administrative remedies.

Even if § 405(h) does not require exhaustion, the Certification Act impliedly prohibits pre-enforcement review. Courts respect Congress's choice to allocate initial review of a claim to an agency process where that intent is "fairly discernible" in the statute. *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207, 216 (1994) (internal quotation marks omitted). In such circumstances, claims may proceed outside that scheme only if they are not "of the type Congress intended to be reviewed within th[e] statutory structure." *Id.* at 212; *see also Berkley v. Mountain Valley Pipeline,*

*LLC*, 896 F.3d 624, 630 (4th Cir. 2018). Courts "presum[e] that Congress does not intend to limit [district court] jurisdiction" if (1) "a finding of preclusion could foreclose all meaningful judicial review," (2) the suit is "wholly collateral to a statute's review provisions," and (3) the claims lie "outside the agency's expertise." *Elgin v. Dep't of the Treasury*, 567 U.S. 1, 15 (2012) (internal quotation marks omitted).

Here, each factor cuts in favor of administrative review. First, requiring exhaustion here would delay, not foreclose, judicial review. Just as OPOs before the Certification Act challenged the validity of the 1996 outcome measures in specific enforcement proceedings, the OPOs here could do the same after they have received their tier ratings and presented their arguments against that rating to the agency. *See Ark. Reg'l Organ Procurement Agency*, 104 F. Supp. 2d at 1085 (challenging standards after receiving notice of decertification); *Nater-Lebron*, 120 F. Supp. 2d at 176 (same).

Nor is the suit "collateral" to the Certification Act's review provisions. Congress reacted to the uncertainty engendered by the 2000 litigation over the recertification process not by providing a pre-enforcement remedy, but by requiring an expedited administrative appeals process. *See* 42 U.S.C. § 273(b)(1)(D)(ii); 71 Fed. Reg. at 30,992. An expedited administrative process serves little purpose if an OPO goes straight to court. The better understanding of the Certification Act is that it requires OPOs first to complete the expedited administrative process and then seek judicial review.

Finally, the claims lie squarely within the agency's expertise. Many of the OPOs' arguments address the agency's analysis of organ procurement data, Pls' Mot. at 28–29, the factors that affect OPO performance, *id.* at 28–31, and the statistical methodology the agency uses, *id.* at 31–33—all issues over which the agency has considerable expertise.

22

While the OPOs argue some issues might not be addressed by the agency itself in an adjudication, following the appropriate process still might "obviate the need to address" any remaining issues. *See Elgin*, 567 U.S. at 22. For example, if some of the OPOs end up in Tier 1 or do not satisfy the 2006 process measures, they would not need to challenge the 2020 outcome measures. Allowing the administrative process to play out will both clarify and narrow the issues for any future court action.

## II.    The 2020 Final Rule is well within the confines of statutory authority Congress delegated to the Secretary.

On the merits, the OPOs first attack the Secretary's statutory authority to promulgate the 2020 Final Rule. "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority." *Loper Bright Enters.*, 603 at 412. Some such statutes "'expressly delegate[]' to an agency the authority to give meaning to a particular statutory term." *Id.* at 394−95 (quoting *Batterton v. Francis*, 432 U.S. 416, 425 (1977)). Others "empower an agency to prescribe rules to 'fill up the details' of a statutory scheme" or to "regulate subject to the limits imposed by a term or phrase that 'leaves agencies with flexibility.'" *Id.*

When a provision expressly delegates such discretionary authority to the Secretary, "the Secretary adopts regulations with legislative effect," and a "court is not free to set aside those regulations simply because it would have interpreted the statute in a different manner." *See Batterton*, 432 U.S. at 425. In that case, a court's only role is "to independently identify and respect such delegations of authority, police the outer statutory boundaries of those delegations, and ensure that agencies exercise their discretion consistent with the APA." *Loper Bright*, 603 U.S. at 404. And even absent a delegation, courts give "due respect" to an agency's interpretation, which is "especially informative to the extent it rests on factual premises within [the agency's] expertise" or forms the "longstanding practice of government." *Id.* at 386, 402 (internal quotation marks

23

omitted).

The OPOs argue that the tier system exceeds the Secretary's statutory authority. Pl's Mot. at 18–27. That argument is wrong. The statute expressly delegates to the Secretary the authority to determine how OPOs may meet the Secretary's outcome measures twice over—once in the introductory clause to 42 U.S.C. § 273(b), and again in 42 U.S.C. § 273(b)(1)(D)(ii). Sometimes, "the best reading of a statute is that it delegates discretionary authority to an agency." *Loper Bright*, 603 U.S. at 395.

First, the statute provides that compliance with the requirements in § 273(b) is "as determined by the Secretary." Congress "expressly delegates gap-filling authority to the Secretary through [an] 'as determined by the Secretary' clause." *Baptist Mem'l Hosp. - Golden Triangle, Inc. v. Azar*, 956 F.3d 689, 693 (5th Cir. 2020); *see Children's Hosp. Ass'n of Tex. v. Azar*, 933 F.3d 764, 770 (D.C. Cir. 2019) (noting these provisions involve "no need to search for statutory ambiguity"). By delegating to the Secretary the authority to "determine[]" whether an OPO complies with the requirements in § 273(b), the statute delegates to him how to "fill up the details" of how OPOs must do so, including by comparing their performance. *See Loper Bright*, 603 U.S. at 394−95 (internal quotation marks omitted).

The Certification Act doubles down on the delegation and grants the Secretary express authority to decide the proper process to evaluate compliance with performance measures. That law delegated to the Secretary the authority to determine compliance with performance measures "defined through regulations that are promulgated by the Secretary." *See* 42 U.S.C. § 273(b)(1)(D)(ii). As Judge Sutton has explained, "the request to define implies a need to define," and places the agency at the "apex of its authority." *Henry Ford Health Sys. v. HHS*, 654 F.3d 660, 665 (6th Cir. 2011). *Loper Bright* cited one such example where Congress delegated to the

24

Secretary the authority to "prescribe standards for determining what constitutes 'unemployment'" to qualify for a particular benefit program. *Batterton*, 432 U.S. at 425 (cited by *Loper Bright*, 603 U.S. at 394−95). Similarly, a delegation to develop a "process" to evaluate compliance with performance measures encompasses how to measure compliance with those measures.

The OPOs argue that the Final Rule is unlawful because Congress did not expressly "instruct[] [CMS] to conduct competitions." Pl's Mot. at 20–21.[2] Even accepting the OPOs' premise, that is not what CMS is doing here. The Final Rule does not force OPOs to compete with one another for recertification. Rather, CMS calculates an individual OPO's outcome measures using area-specific data and compares that area-specific data with the threshold rates for each Tier rating. 42 C.F.R. § 486.318(e)(1). That does not create competition among OPOs for recertification; no OPO's recertification depends on another OPO not being recertified. As the Secretary explained, his "methodology allows all OPOs the opportunity to perform as well as the top OPOs." 85 Fed. Reg. at 77,913. First, "the threshold rate is based on the previous year's" performance, meaning that all OPOs can achieve it. *Id.* Second, the agency explained that "the outcome measures requirement does not require an OPO's performance be at or above the lowest rate for the top 25 percent of all of the OPOs." *Id.* at 77,911. Instead, the agency uses confidence intervals to rank the OPOs, meaning OPOs "must not be statistically significantly differen[t]" from the top 25 percent of OPOs from the prior year. *Id.* And only organizations falling below the

---

[2]     The OPOs' assertion that protecting OPOs from competition was a "central element" of the Certification Act, Pls' Mem. at 21, is demonstrably incorrect. Congress was primarily concerned with reducing uncertainty, improving OPO performance and, above all, "increas[ing] organ donation and the number of transplantable organs available for persons experiencing organ failure." 71 Fed. Reg. at 31,035; *see also* Certification Act § 701(b)(2), 144 Stat. at 2346 (codified at 42 U.S.C. § 273 note) (finding that the current certification and recertification process created "a level of uncertainty" that is interfering with the "effectiveness of organ procurement organizations in raising the level of organ donation").

median are decertified, so that "mid-performing OPOs" have the "opportunity to demonstrate, through the competition process, that they have implemented the requisite changes to progress to becoming a Tier 1 OPO." *Id.* at 77,913. Together, the agency expected these factors to provide both the incentive and opportunity for "all OPOs to cluster near the top," while acknowledging the number of OPOs might initially constrict. *Id.*

The OPOs argue that the statute precludes CMS from comparing OPOs' performance and outcome measures when making recertification decisions. Pl's Mot. at 19. The statutory language the OPOs rely on contains no such limitation. That language requires that the Secretary base his outcome and performance measures on "organ donor potential and other related factors . . . *in each service area*." 42 U.S.C. § 273(b)(1)(D)(ii)(II) (emphasis added). That is precisely what the Secretary did. The Final Rule expressly provides that the donation rate is calculated using "the number of donors *in the [designated service area]* as a percentage of the donor potential." 42 C.F.R. § 486.318(d)(1)(i) (emphasis added). The same is true of the organ transplantation rate. *Id.* § 486.318(d)(1)(ii) ("The organ transplantation rate is calculated as the number of organs transplanted from donors *in the [designated service area] as a percentage of the donor potential*."). Both of those outcome measures rely on "donor potential," 42 C.F.R. § 486.318(d)(1)(iv), which is "the number of inpatient deaths *within the [service area]* among patients 75 and younger with a primary cause of death that is consistent with organ donation," *id.* § 486.302 (emphasis added). Neither does the Final Rule render that "within the [service area]" language surplusage. Pl's Mem. at 19. The purpose of that language was to address CMS's pre-2000 measures' "exclusive reliance on population-based measures of performance." Pub. L. 106-505 § 701(b)(4)(A), 144 Stat. at 2346. By calculating service-area-specific outcome measures and comparing that to the national average, CMS no longer relies exclusively on population-based

26

measures. Accordingly, the Secretary's measures are therefore "based on empirical evidence" from OPOs' specific service areas.

The statute says nothing about how the Secretary must use those measures to decide whether to recertify an OPO. *See generally* 42 U.S.C. § 273(b)(D)(ii). Instead, the statute expressly delegates to the Secretary to decide how to process that data. *Id.* § 273(b)(D)(ii) (providing that an OPO must meet the performance standards "through a process that . . . is defined through regulations that are promulgated by the Secretary"); *see also id.* § 273(b)(1) ("as determined by the Secretary"). That statutory language does not expressly prohibit the Secretary from comparing OPOs as part of that process. The OPOs not only seek to enforce a rule found nowhere in the statutory text, but they ask this Court to override the text's express delegation to the Secretary to ascertain whether OPOs have complied with his outcome measures. A standard is simply "[a] criterion for measuring acceptability, quality, or accuracy." *Standard*, Black's Law Dictionary (12th ed. 2024). The statute is silent about the content of that "criterion" and never suggests it cannot be informed by how other OPOs perform.

Indeed, the Secretary's consistent practice both before and after Congress enacted 42 U.S.C. § 273(b)(1)(D)(ii) was to measure outcomes based on OPOs' relative performance. The 1996 outcome measures required OPOs to be within 75% of the national mean of OPOs on four of five metrics. 61 Fed. Reg. at 19,744. Two of the three 2006 outcome measures also required that an OPO not fall below a certain standard deviation below the mean of all OPOs. 71 Fed. Reg. at 31,050. The 2020 outcome measures thus follow a long history of the Secretary setting minimum outcome performance requirements based on the relative performance of all OPOs. Had Congress intended to stop CMS from abandoning its use of comparative statistics in its recertification process, it would have done so expressly. That consistent government practice based on matters

27

within the agency's factual expertise may be "especially informative" to the court. *Loper Bright*, 603 U.S. at 402.

The statute requires that CMS's recertification process be "based on" performance data within an OPO's service area. The phrase "based on" simply means "[d]erived from." *Based on*, Black's Law Dictionary (12th ed. 2024); *see also* Merriam-Webster's Collegiate Dictionary, 101 (11th ed. 2007) (defining "base" as (1) "a main ingredient"; (2) "a supporting or carrying ingredient"; (3) "the fundamental part of something"); *cf. Norem v. Lincoln Ben. Life Co.*, 737 F.3d 1145, 1149–50 (7th Cir. 2013) (rejecting an argument that "'based on' implies 'exclusivity'"). There can be no question that service-area data forms the foundation for the outcome measures CMS adopted in the Final Rule. *See* 42 C.F.R. § 486.318(d)(1)(i) ("The donation rate is calculated as the number of donors in the [designated service area] as a percentage of the donor potential."). It does not follow, however, that CMS must exclusively consider service-area data in evaluating OPO performance. *See Norem*, 737 F.3d at 1149–50.

The Final Rule does, however, allow OPOs to request a one-year extension if "circumstances beyond the control of the OPOs" have "affected the data of the final assessment period so that it does not accurately capture their performance." 42 C.F.R. § 486.316(f). That provision further addresses service-area-specific concerns, such as the particular flaws with death certificate data in Alabama certain commenters identified. *See* 85 Fed. Reg. at 77,906−07; RR-01641.

In any event, the statute makes clear that Congress intended for there to be some competition among OPOs by creating a system under which CMS must recertify OPOs every four years. Under that statutory scheme, if an OPO is not recertified, eligible OPOs are permitted to step in to compete for that service area. *See* 71 Fed. Reg. at 30,992.

The OPOs also point to CMS's past statements that it cannot certify new OPOs. While the Secretary acknowledges his prior statements, he does not now believe those statements reflect the "single, best meaning" of the statute and so does not intend to interpret the statute in that way in the future. *Loper Bright*, 603 U.S. at 400.[3] Nothing in the statute bars the agency from certifying either an entirely new OPO or one that was previously decertified. Before the Certification Act, the Secretary regularly certified new OPOs. To be sure, after the passage of the Certification Act, the Secretary suggested that he lacks authority to certify new OPOs. *See* 85 Fed. Reg. at 77,898 (noting "no current statutory authority to add new OPOs"); 71 Fed. Reg. at 30,998 (similar). But nothing in the text of either the statute or the associated Congressional findings explicitly strip the agency of that authority. Rather, the statute contemplates that OPOs may be "certified *or* recertified." *See* 42 U.S.C. § 273(b)(1)(D) (emphasis added). That language is inconsistent with a reading that would prohibit the Secretary from recognizing any new OPOs requiring initial certifications. There is no "hunger games" at all, just an incentive for OPOs to recover more organs each year. *Cf. Adventist Health Sys./SunBelt, Inc.*, 17 F.4th at 796 (purpose of OPOs is to "reduce chronic shortages of donated organs urgently needed by patients awaiting transplants").

The OPOs argue that the Final Rule is unlawful because CMS cannot require OPOs to compete for their service area if they have not been decertified. Pls' Mot. at 23–26. Notably, the OPOs do not dispute that CMS has the authority to open service areas for competition if an area's designated OPO is decertified. *See id.* Nor could it, given the statute directs the Secretary to designate "one organ procurement organization for each service area." 42 U.S.C. § 1320b-8(b)(2).

---

[3]     The Secretary acknowledges that he promulgated a regulation requiring that to be "certified as a qualified organ procurement organization," an organization must have "been re-certified as an OPO under the Medicare program from January 1, 2002 through December 31, 2005." 42 C.F.R. § 486.303(e). This regulation is not required by the statute, and the Secretary has recently proposed removing that requirement. *See* 91 Fed. Reg. 4190, 4191 (Jan. 30, 2026).

Instead, they argue that requiring OPOs in Tier 2 to compete for their previously-assigned service areas violates CMS's regulations at 42 C.F.R. § 486.308. To be sure, that regulation provides that a "service area is open for competition when the OPO for the service area is de-certified." 42 C.F.R. § 486.308(a). But that is not a statutory requirement. And even if it were, it does not expressly preclude competition in other circumstances, even if an OPO is recertified. Thus, it does not conflict with the Final Rule's more specific rules governing recertification and competition. 42 C.F.R. § 486.316(a); A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 154 (2012) ("If there is a conflict between a general provision and a specific provision, the specific provision prevails."). It is also more lenient than CMS's original proposal, to automatically de-certify Tier 2 OPOs. 85 Fed. Reg. at 77,912–13.

Neither does the statutory waiver process limit CMS's authority to require Tier 2 OPOs to compete for service areas. Pls' Mot. at 24. Congress created the waiver process for hospitals that wish to contract with a different OPO than its designated one. 42 U.S.C. § 1320b-8(a)(2). That process applies outside of the normal certification process, meaning a hospital can seek a waiver at any time, including within the four-year certification period, and it is an exception to the general requirement that hospitals must contract with its designated OPO. *Id.* In other words, it gives hospitals some say in what OPO they work with. It is unrelated to the certification process. The same is true for the appeals process. Pls' Mot. at 25–26.

The OPOs' unconstitutional conditions argument, Pls' Mot. at 26–27, is similarly without any merit. As explained above, the OPOs can claim no prior statutory entitlement to be free from competition. Moreover, the Final Rule imposes no "retroactive" conditions because it applies prospectively, and the tiered ranking system is not "a major change in [the] program." Pl's Mot. at 26–27 (quoting *National Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 583 (2012)).

30

III.    **The 2020 Final Rule's outcome measures are not arbitrary or capricious.**

The OPOs next argue that the 2020 Final Rule is arbitrary and capricious under the APA. "The scope of this review is narrow, and reviewing courts must exercise appropriate deference to agency decisionmaking and not substitute their own judgment for that of the agency." *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 567 (2025) (internal quotation marks omitted). Under this "deferential" standard, the court "simply ensures that the agency has acted within a zone of reasonableness." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). And a court must "uphold a decision" of even "less than ideal clarity" so long as "the agency's path may reasonably be discerned." *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted).

A.    **CMS reasonably relied on death certificate data and adequately explained its reasons for doing so.**

The OPOs first take aim at CMS's decision to measure donor potential in part by using the primary cause of death listed on death certificate data. Pl's Mot. at 28–29, 29–31. CMS provided a reasonable explanation for its choice of that data—that the data avoided the potentially self-serving inconsistencies of the agency's prior metric, which relied on self-reported and unaudited data from OPOs. *See* 84 Fed. Reg. at 70,630. And it cited both stakeholder feedback and a peer-reviewed study. *Id.* at 70,647 (citing RR-02578−2587). Under the new approach, the agency can rely on death certificate data available from the CDC, which allows the agency to verify for itself the correct donor potential number. 85 Fed. Reg. at 77,906.

The OPOs list several purported flaws with death-certificate data from the CDC, but they fail to acknowledge that CMS addressed those concerns in the Final Rule. 85 Fed. Reg. at 77,906 & 77,908. CMS further explained that it had considered a slew of other potential data sources, but ultimately concluded it could not obtain those data through "reasonable efforts," 85 Fed. Reg. at

31

77,907, which is the relevant statutory standard, 42 U.S.C. § 273(b)(1)(D)(ii)(II). As the Supreme Court has explained, it is "not unusual in day-to-day agency decisionmaking" for agencies to "not have perfect empirical or statistical data." *Prometheus Radio Project*, 592 U.S. at 427. All that the APA requires is that the agency "clearly thought about the . . . objections and provided reasoned replies." *City of Portland, Or. v. E.P.A.*, 507 F.3d 706, 714 (D.C. Cir. 2007).

That is exactly what CMS did here. It explained that adjusting for ventilator data "would not alter the interpretation of among-OPO performance." *See* RR-2604. CMS pointed to a study that explained that "the near-perfect correlation of the" agency's donor potential metric with "the different 'adjusted' metrics" using additional data "shows that these additional qualifiers do not impact" donor potential's "utility for capturing *relative* performance" amongst OPOs. RR-02602 (emphasis in original). That is more than enough here, where the court "give[s] an extreme degree of deference to the agency when it is evaluating scientific data within its technical expertise," *Nat'l Min. Ass'n v. Sec'y*, 812 F.3d at 866, "even if, as an original matter, a court might find contrary views more persuasive," *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989).

**B.    CMS's decision to consider data from the prior 12 months is reasonable.**

The OPOs next argue that CMS's decision to evaluate OPOs' performances based on twelve months of data rather than a broader period was unreasonable. Pl's Mot. at 29. But CMS addressed those concerns as well, providing three reasons for doing so. First, CMS explained that a recertification decision should measure the "current performance of the OPO" seeking recertification, which incorporating data from several years prior would "mask." 85 Fed. Reg. at 77,915. Second, it noted that using older data would "penalize OPOs who have made the effort to improve performance," *id.*, and so the window aligns with the statutory goal of incentivizing improvement, *cf. Adventist Health Sys./SunBelt, Inc.*, 17 F.4th at 796. And finally, because it takes time to improve donation and transplantation rates, using older data would anchor OPOs who take

over new service areas to their predecessors' rating even if they improved substantially thereafter. 85 Fed. Reg. at 77,915.

CMS acknowledged that an OPO's performance might vary year-over-year, which may contribute to greater variance. In response, the agency explained that incorporating statistical confidence intervals would "account for the potential variability" from year to year, particularly for "smaller OPOs" whose data fluctuates the most. *See* 85 Fed. Reg. at 77,915. Further acknowledging that some statistical variance might be due to factors outside an OPO's control, CMS gave OPOs the option to seek a one-year extension in the event of extenuating circumstances that made the relevant years' data unreliable. *Id.*

### C.    CMS adequately responded to concerns about factors beyond OPOs' control.

The OPOs next contend that CMS failed to consider "inherent demographic and geographic variations" among the different service areas, arguing that CMS's chosen methodology will unfairly benefit OPOs with "smaller service area populations." Pl's Mot. at 29–30, 31–33. In the Final Rule, CMS acknowledged that its measures "do not control for every variable that can affect OPO performance for reasons beyond its control," but explained that they nevertheless capture the key donation and transplantation outcomes while being sensitive to factors like "geographic differences in the number and causes of death" through its donor potential metric. 85 Fed. Reg. at 77,928−29.

CMS also analyzed whether sicker populations or other demographic factors influenced outcomes. *Id.* at 77,909−10. When proposing the new outcome measures, the agency acknowledged "literature identifying racial disparities among organ donors," 84 Fed. Reg. at 70,634; RR-02722−02727, but it noted "more recent evidence suggesting that the racial concordance of the OPO requester plays a role in the rate of authorization for organ donation," *id.*; RR-02553−67. Taking that evidence together with the observation that there are top-performing

OPOs serving diverse populations, CMS concluded that "OPOs should adjust their practice to overcome these hurdles," and not use pleas of cultural difference "to mask poorer performance" and risk "perpetuat[ing] stereotypes of different racial/ethnic groups and their willingness and ability to be organ donors." 85 Fed. Reg. at 77,910. In the end, "[t]he agency need not have reached the same conclusion that the reviewing court would reach; the agency must merely have reached a conclusion that rests on a rational basis." *City Of Oxford, Ga. v. FAA.*, 428 F.3d 1346, 1352 (11th Cir. 2005).

The OPOs argue that the Final Rule's use of confidence intervals will disadvantage OPOs that serve large populations. Pl's Mot. at 32–33. As an initial matter, the OPOs do not complain that CMS is incorrectly calculating confidence intervals or dispute that confidence intervals are an accepted statistical tool. *See* 84 Fed. Reg. at 70,641 (explaining methodology and citing statistical literature). Instead, they suggest that applying confidence intervals means that smaller organizations can fall further below the previous year's median rates than larger organizations without being decertified.

That argument reflects a fundamental misunderstanding of confidence intervals. Confidence intervals ensure that any differences between an OPOs' outcome measure and the Tier 1 or Tier 2 cutoff are "statistically significant[]," meaning an OPO is not classified as Tier 2 rather than Tier 1 purely because of chance. 85 Fed. Reg. at 77,904, 77,911. They address two issues that OPOs elsewhere highlight. First, they ensure that an OPOs' rating in a given year reflects actual differences in performance, rather than the random fluctuations in donation and transplantation. *See id.* at 77,914. Second, they ensure that the thresholds do not treat statistically indistinguishable performance differently, so that all similarly performing OPOs achieve the same Tier rating. *See id.* at 77,912. To be sure, CMS acknowledged that larger OPOs will have tighter confidence

34

intervals than smaller OPOs. *Id.* at 77,914. But that is not bias, as the OPOs contend, because larger OPOs serve larger populations. *Id.* One expects to see less variation from chance in an OPO serving a larger population than a smaller one. *Id.* Far from treating like cases unalike, confidence intervals help the agency account for relevant differences between OPOs.

The OPOs accuse CMS of being inconsistent by not using a similar risk-adjustment methodology that it adopted for transplant hospitals in a recent rulemaking. Pl's Mot. at 31. But that rule is for a Medicare payment model that tests whether a particular pricing methodology for six non-transplant procedures reduces Medicare costs. *See* 89 Fed. Reg. 68,986, 69,630 (Aug. 28, 2024). It is not unreasonable to treat different models with different goals addressing different medical procedures differently.

### D.      CMS sufficiently explained its choice of a 25% threshold for Tier 1 OPOs.

The OPOs argue that CMS failed to respond to comments challenging its decision to use a 25% threshold. The agency explained the 25% threshold for three reasons. First, the "wide variation in donation rates among OPOs" suggested significant room for improvement. 84 Fed. Reg. at 77,0635 (noting 30% or 40% threshold might have been appropriate absent such wide variation). Second, CMS calculated that the 25% threshold based on the number that would "doubl[e] kidney transplants by 2030." 85 Fed. Reg. at 77,914. And third, the 25% threshold included "a diversity of OPOs serving a range of geographic areas and different donor potentials," suggesting the goal was achievable despite those differences. *Id.*

CMS acknowledged that a 25% threshold, standing alone, was "aggressive." *Id.* at 77,911. Indeed, the agency analyzed numerous potential other thresholds—including the mean and the median OPO performer, *id.*; *see also* 84 Fed. Reg. at 70,692−96—which were closer to the 1996 and 2006 threshold. And the agency considered the burden on OPOs, pointing out "even though many OPOs did not meet the threshold rate, they were quite close." 85 Fed. Reg. at 77,913.

35

Ultimately, the agency modified its final rule in response to these comments. In the Final Rule, CMS determined that it would not decertify all OPOs below the 25% threshold, as it had initially proposed, but would allow Tier 2 OPOs between the median and 25% threshold to compete to retain their service area, which would "incentivize continual improvement." *Id.* at 77,912−13.

### E.    CMS adequately responded to comments about potential consolidation.

Finally, the OPOs argue that CMS failed to consider the possibility that up to "60% of donor service areas nationwide would instantly be opened to competition" resulting in "an ever-shrinking pool of OPOs." Pl's Mot. at 34. CMS did consider that possibility and concluded that it does not anticipate any such consolidation. 85 Fed. Reg. at 77,913. CMS explained that its new outcome measures were necessary because "the current OPO outcome measures are not sufficiently objective and transparent to ensure public trust in assessing OPO performance, nor do they properly incentivize the adoption of best practices and optimization of donation and organ transplantation rates." *Id.* Indeed, in proposing the rule in the first place, CMS found that the top quarter of OPOs achieve donation rates "more than double the rates of many lower performing OPOs," despite being demographically and geographically diverse. 84 Fed. Reg. at 70,644; *see also id.* at 70,635 (citing study suggesting room for improvement). The OPOs overlook that they were given the privilege of a government monopoly over organ procurement within their service area, not to mention government funds. It is therefore "critical" to "select the most capable OPO" for each area, "rather than automatically re-certify the incumbent OPO." 85 Fed. Reg. at 77,913.

The agency considered comments suggesting it place poorly performing OPOs on an improvement plan rather than open their service areas up to competition. 85 Fed. Reg. at 77,912. It also considered simply decertifying Tier 2 OPOs. *Id.* CMS supported that decision by pointing to the fact that it publishes tier data each year and requires regular quality assessments as a process measure. The proper time to address performance issues is the first time an OPO falls below the

thresholds, not after the end of the recertification cycle. *Id.* Nor does it help patients to require them to work with poorer performing OPOs "if there is a better performing OPO willing and able to service the" area "and provide patients with a higher standard of service." *Id.* In the end, CMS forged a middle path, allowing Tier 2 OPOs the opportunity to compete and an incentive to improve, while recognizing that there may be instances where it might not be in "patients' best interest to de-certify those OPOs, unless there is a better OPO prepared and capable of taking over the" service area. *Id.*

The agency also analyzed potential disruptions. CMS explained that it believed that by the 2026 recertification cycle "almost all OPOs will be able to comply with the new tiered standards or will arrange a friendly merger with another OPO." 85 Fed. Reg. at 77,935. And it explained that when an OPO is decertified, it expects the new OPO to "arrange a smooth continuation of services," including through retaining necessary staff from the departing OPO, *id.*, which prevent the disruption to the relationships the OPOs highlight. While acknowledging the limitations of the analogy, the Secretary also pointed to studies showing little disruption to patients when hospitals merge. *Id.* at 77,941; RR-02618−42; RR-2795–69; RR-2618–2642.

## CONCLUSION

The plaintiff OPOs' motion for summary judgment should be denied and CMS's cross-motion should be granted because the OPOs failed to channel their claims through the administrative appeals process and because the 2020 Final Rule complies with both the Certification Act and the APA.

Dated:  April 24, 2026                    Respectfully submitted,

                                          JEANINE FERRIS PIRRO
                                          United States Attorney


                                          By:    /s/ Allison I. Brown
                                          ALLISON I. BROWN
                                          Assistant United States Attorney
                                          District of Columbia
                                          601 D Street, NW, Washington, D.C. 20530
                                          Telephone: (202) 252-7822
                                          Email: Allison.Brown2@usdoj.gov


OF COUNSEL:

MICHAEL B. STUART
General Counsel

ELIZABETH C. KELLEY
Deputy General Counsel
Chief Legal Officer for CMS

BETSY M. PELOVITZ
Associate General Counsel

JOCELYN S. BEER
Acting Deputy Associate General Counsel for Litigation

GARRETT F. MANNCHEN
Attorney

U.S. Dept. of Health & Human Services

*Attorneys for the United States of America*

38

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NEW ENGLAND DONOR SERVICES, INC.,
*et al.*,

        Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et al.*,

        Defendants.

Civil Action No. 25-4329 (SLS)

## [PROPOSED] ORDER

UPON CONSIDERATION of Plaintiffs' motion for summary judgment, Defendants' cross-motion for summary judgment, and the entire record herein, it is hereby ORDERED that:

1. Plaintiffs' motion for summary judgment is DENIED;

2. Defendants' cross-motion for summary judgement is GRANTED;

3. Judgment is granted in favor of Defendants on all counts of the Complaint; and

4. The Clerk of Court is directed to CLOSE this case.

SO ORDERED:

_____
Date

_____
SPARKLE L. SOOKNANAN
United States District Judge