**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NEW ENGLAND DONOR SERVICES, INC., *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,<br><br>*Defendants*. | Civil Action No. 25-4329 (SLS)<br>Judge Sparkle L. Sooknanan |

**MEMORANDUM OPINION**

Organ donation is a tremendous act of selflessness and a vital means of extending the lives of many critically ill patients. Tens of thousands of donations occur annually across the United States. Recognizing the need for a well-functioning system to facilitate donations, Congress established a complex scheme that relies on the federal government, nonprofits, and hospitals to work together to safely and equitably connect patients to lifesaving organs. Congress entrusted Organ Procurement Organizations (OPOs) with many responsibilities in this scheme, including the acquisition, preservation, and transportation of donated organs.

This case involves a rule promulgated in 2020 (2020 Rule) by the Centers for Medicare and Medicaid Services (CMS), an arm of the Department of Health and Human Services (HHS), that changed the way that OPOs are certified to conduct their critical work. Roughly five years later, shortly before the implementation of that rule, multiple OPOs brought this Administrative Procedure Act (APA) action seeking to vacate it and set it aside. They allege that the 2020 Rule exceeds the agency's statutory authority in several respects and is arbitrary and capricious. The

Defendants—HHS, CMS, and agency heads sued in their official capacities—argue that the Court lacks jurisdiction to consider the Plaintiffs' claims because they should be brought in the first instance through an administrative adjudicatory process. And they defend the legality of the 2020 Rule on the merits.

The Court concludes that there are no bars to judicial review, but it agrees with the Defendants that the 2020 Rule is lawful under the APA. The agency acted well within its statutory authority in promulgating the rule by exercising discretion conferred by Congress. And it acted within a zone of reasonableness in its decision making, precluding any finding that the 2020 Rule is arbitrary and capricious. The Court recognizes that reasonable minds could differ with respect to some of the policy decisions reflected in the 2020 Rule. But under the APA, it is not the role of the judicial branch to substitute its judgment for that of the agency.

## BACKGROUND

### A. Statutory Background

Congress passed the National Organ Transplant Act of 1984, Pub. L. No. 98-507, 98 Stat. 2339 (codified at 42 U.S.C. §§ 273 *et seq.*), to coordinate a safe and effective national system for organ procurement and transplantation. The Act criminalized the sale of human organs for profit, *see* 42 U.S.C. § 274e, and "codified a major federal public-private effort to reduce chronic shortages of donated organs urgently needed by patients awaiting transplants[,]" *Adventist Health Sys./SunBelt, Inc. v. HHS*, 17 F.4th 793, 796 (8th Cir. 2021). CMS oversees this system of organ procurement and transplantation. *See* 42 U.S.C. §§ 273–274g, 1320b-8.

#### 1. Organ Procurement Organizations

OPOs are the nonprofits at the core of this system. OPOs "acquire all useable organs from potential donors," "arrange for the acquisition and preservation of donated organs[,]" and "provide or arrange for the transportation of donated organs to transplant centers[.]" 42 U.S.C.

§ 273(b)(3)(B), (C), (F). OPOs do not operate on patients or decide which patients receive organs—those responsibilities are within the purview of hospitals and a specialized nonprofit entity, respectively. *See Doe v. Kennedy*, CIV. NO. 26-2937, 2026 WL 1412609, at *1–2 (E.D. Pa. May 20, 2026) (describing the statutory scheme). Instead, OPOs control many of the steps that other organizations cannot handle, including communicating with donors, families, hospitals, and transplant centers to effectively identify, procure, preserve, and deliver donated organs to patients in need.

Medicare reimburses OPOs directly for the costs of procuring kidneys. *See* 42 U.S.C. § 273(b)(1)(C); 42 C.F.R. § 413.420. And it pays OPOs indirectly for the costs of procuring other organs by reimbursing hospitals for qualifying payments to OPOs. *See* 42 U.S.C. § 1320b-8(b)(1). OPOs bill transplant hospitals their costs to procure organs, and those hospitals submit the costs to Medicare for reimbursement. See 42 C.F.R. § 413.404(a)(3), (c); 42 C.F.R. § 413.402(b)(9).

Congress granted each OPO an exclusive territory in which to operate, known as a donation service area (DSA). *See* 42 U.S.C. § 273(b)(1)(E) (requiring qualified OPOs to have a DSA); 42 U.S.C. § 1320b-8(b)(2) (explaining that "[t]he [HHS] Secretary may not designate more than one organ procurement organization for each service area"). The statutory scheme contemplates that OPOs will have strong relationships within their respective DSAs. *See id.* § 273(b)(1)(G) (requiring OPO boards to include members from their local service areas). And OPOs must serve "a substantial majority of the hospitals and other health care entities" within their DSAs that have facilities for donations. *Id.* § 273(b)(3)(A). As of March 2026, there were 55 certified OPOs across the country, each serving an exclusive DSA. Am. Compl. ¶ 33, ECF No. 14.

CMS enforces exclusivity within DSAs by imposing conditions on hospitals. Specifically, to maintain their eligibility for Medicare reimbursements, hospitals must contract with the OPO in

the DSA where the hospital is located. 42 U.S.C. § 1320b-8(a)(1); 42 C.F.R. §§ 486.308(c), 482.45(a). In other words, to receive Medicare reimbursement, all hospitals that recover or transplant organs must be affiliated with their designated OPO. *See* 42 U.S.C. § 1320b-8(a)(1)(C). Hospitals wishing to contract with another OPO must seek a waiver from the HHS Secretary. *See id.* § 1320b-8(a)(2).

**2. OPO Certification**

OPOs must meet certain requirements to be "certified or recertified" as "qualified" by the HHS Secretary. 42 U.S.C. § 273(b). Congress charged the Secretary by statute to create a framework to certify, recertify, and decertify OPOs. *Id.* § 273(b)(1)(D)(ii). Critically, OPOs that are not certified cannot receive federal funds and cannot sign agreements with hospitals that receive such funding. *See id.* § 1320b-8(b)(1)(A)(ii), (a)(1)(C); 42 C.F.R. § 486.312(e); *see also* 42 U.S.C. § 1320b-8(b)(1)(C) (authorizing payments to OPOs that "meet[] performance-related standards prescribed by the Secretary"). This makes certification a high-stakes process—both for the survival of OPOs and for the effectiveness of the organ transplantation system.

The OPO certification process has changed over time. Before 2000, HHS required OPOs to "achieve at least 75 percent of the national mean for four of . . . five performance categories, averaged over the 2 calendar years before the year of redesignation[.]" 61 Fed. Reg. 19,722, 19,744 (May 2, 1996) (then-codified at 42 C.F.R. § 486.310(b)). These categories compared the number of donors, organs recovered, and organs transplanted to a given DSA's population in different ways. *Id.*

Congress later passed the Organ Procurement Organization Certification Act of 2000, Pub. L. No. 106-505, Title VII, 114 Stat. 2314, 2346–48 (Certification Act), to address shortcomings in the certification process that had "created a level of uncertainty" and impacted OPOs'

effectiveness, 144 Stat. at 2346 (codified at 42 U.S.C. § 273 note). The law specifically addressed two limitations in the recertification process. *Id.* First, Congress was concerned that the recertification process exclusively relied on population-based performance measures that did "not permit consideration of other outcome and process standards" that would better measure OPO performance. *Id.* Second, Congress was troubled that OPOs who were denied recertification lacked an opportunity to appeal to the Secretary. *Id.*

Congress codified its solutions from the Certification Act through an amendment to one statutory provision, 42 U.S.C. § 273(b)(1), which governs today. 144 Stat. at 2347. The revised statute addressed Congress's two concerns. First, it created a certification process for OPOs to be "defined through regulations that are promulgated by the Secretary[.]" 42 U.S.C. § 273(b)(1)(D)(ii). Specifically, Congress required the Secretary to "rely on outcome and process performance measures that are based on empirical evidence, obtained through reasonable efforts, of organ donor potential and other related factors in each service area of qualified organ procurement organizations[.]" *Id.* § 273(b)(1)(D)(ii)(II). Congress also required that the Secretary "use multiple outcome measures as part of the certification process[.]" *Id.* § 273(b)(1)(D)(ii)(III). Second, the statute required the Secretary to allow for OPOs "to appeal a decertification to the Secretary on substantive and procedural grounds[.]" *Id.* § 273(b)(1)(D)(ii)(IV). And the law required OPOs to be recertified "not more frequently than once every 4 years[.]" *Id.* § 273(b)(1)(D)(ii)(I). Combined, Congress intended for these procedural changes to create "a more streamlined, sequential process" that ensures that a decertified OPO's appeal is resolved before its DSA must be assigned to a different OPO. 71 Fed. Reg. 30,982, 30,997 (May 31, 2006).

Beginning in 2006, CMS promulgated rules defining these new performance measures for OPO certification. *See id.* at 30,982. Consistent with the statute, the CMS rules measured

performance based on both process and outcomes. The process performance measures—which are not at issue here—have remained largely unchallenged and unchanged since 2006. *See* 42 C.F.R. §§ 486.320−360. For example, OPOs must participate in the Organ Procurement and Transplantation Network, *id.* § 486.320, have written agreements with 95% of qualifying hospitals in their DSA, *id.* § 486.322, and have written protocols to manage and evaluate potential donors, *id.* § 486.344.

As for the outcome measures, the 2006 CMS rule employed three metrics: (1) donation rate, (2) observed donation rate, and (3) yield. 71 Fed. Reg. at 31,000 (then-codified at 42 C.F.R. § 486.318(a)). First, the donation rate measured the conversion of potential to actual donors in a DSA, and potential donors were measured by "eligible deaths[.]" *Id.* An OPO's donation rate could not fall more than 1.5 standard deviations below the national mean. *Id.* at 31,050. Second, an OPO's observed donation rate could not be significantly lower than their expected donation rate—derived from a complex formula—by a statistically significant amount. *Id.* at 31,002–03. Third, an OPO had to meet certain "yield" measures—which assessed the number of organs transplanted or used for research per donor—within a maximum number of standard deviations below the national mean. *Id.* at 31,050−51. CMS eventually modified its rule to require OPOs to meet only two of these outcome measures, instead of all three. *See* 78 Fed. Reg. 74,826, 75,144 (Dec. 10, 2013). During the 2022 recertification cycle, CMS further modified the rule to require OPOs to meet only one of the donation rate and yield measures. *See* 84 Fed. Reg. 61,142, 61,434−35 (Nov. 12, 2019).

### 3. Challenged Rulemaking

In 2019, President Donald J. Trump issued an Executive Order, *Advancing American Kidney Health*, which set a goal of "modernizing the organ recovery and transplantation systems

and updating outmoded and counterproductive regulations." Exec. Order No. 13879, 84 Fed. Reg. 33,817, 33,817 (July 10, 2019). To that end, he directed the HHS Secretary to "revis[e] [OPO] rules and evaluation metrics to establish more transparent, reliable, and enforceable objective metrics for evaluating an OPO's performance." *Id.* at 33,818. In response to that Executive Order, CMS proposed a new rule later that year. *Revisions to the Outcome Measure Requirements for Organ Procurement Organization*, 84 Fed. Reg. 70,628 (Dec. 23, 2019). As its title reflects, the proposed rule focused primarily on changing the outcome measures. CMS acknowledged that its 2006 outcome measures were "not sufficiently objective and transparent" and could be improved. *Id.* at 70,628–29. For example, as one large OPO pointed out, the then-existing metrics relied heavily on unaudited and self-reported data from OPOs themselves, which led to inconsistent interpretations. *Id.* at 70,630 (citing RR 3171[1]). CMS found that other measurements, such as the "yield" metric, could incentivize OPOs to "'walk away from cases in which the donor only has one organ viable for transplant'" and thus waste transportable organs. *Id.* (quoting RR 3039).

To solve these issues, CMS proposed to replace its three outcome performance metrics with two new metrics: donation rate and transplantation rate. *Id.* at 70,628–29. The donation rate would measure the number of actual donors compared to the number of potential donors, while the transplantation rate would measure the number of organs transplanted compared to that same number of potential donors. *Id.* at 70,631. Under the proposed rule, CMS would automatically decertify any OPO falling outside the top 25% of those metrics based on a single year of data. *Id.* at 70,634–35. The proposed rule generated over 800 public comments from OPOs, hospitals, donor families, and others. 85 Fed. Reg. 77,898, 77,900.

[1] When a source cited in the Federal Register is also part of the Administrative Record (RR), the Court cites to the Administrative Record for ease of access.

The HHS Secretary promulgated the final rule in 2020. *See* 85 Fed. Reg. at 77,898. That rule adopts the two categories of metrics from the proposed rule: donation rate and transplantation rate. Both metrics are measured based on a final assessment period using 12 months of data. *Id.* at 77,916.

- First, the donation rate captures "the number of donors in the DSA as a percentage of the donor potential." 42 C.F.R. § 486.318(d)(1)(i). Though the 2006 metrics also measured donation rates, the Secretary tweaked the rate's numerator and denominator to better capture OPOs' effectiveness. As to the numerator, the rule defines "donors" as patients from whom "at least one vascularized organ . . . is transplanted[,]" instead of anyone from whom an organ was "recovered." 85 Fed. Reg. at 77,903 (codified at 42 C.F.R. § 486.302). This change was intended to discourage OPOs from discarding procured organs or only seeking cases in which donors have multiple organs viable for transplant. 84 Fed. Reg. at 70,631. As to the denominator, the agency moved away from its previous practice of measuring donors per "eligible death," since that measurement relied on unreliable self-reported data. *See* RR 3171. Instead, the 2020 Rule uses "donor potential" as a denominator, as measured by certain inpatient deaths where the primary cause of death is "consistent with organ donation" based on statistics from the Centers for Disease Control and Prevention's Multiple Cause of Death (MCOD) data set. *See* 42 C.F.R. § 486.318(d)(1)(iv); 85 Fed. Reg. at 77,906.
- Second, an OPO's transplantation rate is calculated as the total "number of organs transplanted from donors in a DSA as a percentage of the donor potential." 42 C.F.R. § 486.318(d)(1)(ii). Responding to commenters' concerns about age-related disparities across OPOs, the 2020 Rule calculates an adjusted transplantation rate for each OPO based

on the age of their potential organ donors. *Id.*; 85 Fed. Reg. at 77,910. By using the donation rate and transplantation rate together, the Secretary sought to incentivize OPOs to both obtain more donors and place more organs. *Id.* at 77,928−29.

The 2020 Rule also takes a different approach to certification. It abandons the proposed rule's automatic decertification of any OPO falling outside the top 25% of these new metrics. Instead, the 2020 Rule adopts a new three-tiered system to determine whether OPOs should be recertified, decertified, or forced to compete to retain their DSA. *See* 42 C.F.R. § 486.318(e). First, OPOs whose donation and transplantation rates are at or above the top 25% of OPOs' rates from the prior year will be assigned to Tier 1. *Id.* § 486.318(e)(4). If a Tier 1 OPO also meets the process measures, they will be recertified and keep their DSA for the following four years. *Id.* § 486.316(a)(1). Next, OPOs will be assigned to Tier 2 if their donation and transplantation rates are at or above the median rate (*i.e.*, top 50%) of OPOs from the prior year, but they have at least one of two metrics not within the top 25%. *Id.* § 486.318(e)(5). Tier 2 OPOs are not recertified or decertified—instead, their DSA becomes "open for competition" from other OPOs. *Id.* § 486.316(a)(2). Finally, OPOs with donation or transplantation rates under the median rate will be assigned to Tier 3 and decertified. *Id.* §§ 486.318(e)(6), 486.316(a)(3). Tier 3 OPOs may appeal their decertification, *id.* § 486.314, but Tier 2 OPOs may not appeal their non-renewal, 85 Fed. Reg. at 77,918. To ensure statistical significance, the OPOs are not placed into tiers based on their raw donation and organ transplantation rates; rather, CMS calculates an OPO's tier based on the upper limit of the one-sided 95% confidence interval for each metric. 42 C.F.R. § 486.318(e).

Due to data availability, CMS will measure OPOs' performance for certification based on lagging data. During the 2022–2026 certification period, CMS will establish the threshold rate based on 2023 data, and the final assessment period will utilize OPOs' performance data from

2024. *See* 85 Fed. Reg. at 77,916. In preparation for this first upcoming cycle, CMS has published a series of interim reports to make OPOs aware of their status. For example, in 2025, a Tier 1 OPO's 2023 donation rate had to exceed 14.11, and its transplantation rate had to exceed 45.67. *See* Ctr. for Medicare & Medicaid Servs., *Public 2024 & 2025 OPO Report*, https://qcor.cms.gov/OPOs [https://perma.cc/53ND-CHAT] (2025) ("OPO Public Performance Report" Link, then "2025 Assessment" Tab). These donation and transplantation rate thresholds were based on 2022 data. The 2025 assessment placed 30 OPOs in Tier 1, 16 OPOs in Tier 2, and 10 OPOs in Tier 3. *Id.* CMS's assessments are somewhat volatile year-over-year. For example, two years prior, CMS placed 15 OPOs in Tier 1, 18 OPOs in Tier 2, and 24 OPOs in Tier 3. *Id.*

**B. Factual and Procedural Background**

The Plaintiffs in this case are three OPOs operating across nine states and territories.[2] Am. Compl. ¶ 14.

- New England Donor Services, Inc. (NEDS) operates in six northeastern states and Bermuda. Decl. of Alexandra K. Glazier (Glazier Decl.) ¶ 3, ECF No. 14-1. NEDS expects to be assigned to Tier 2 for the performance cycle ending in 2026. *Id.* ¶ 13.
- We Are Sharing Hope SC (SHSC) serves the state of South Carolina. Decl. of David DeStefano (DeStefano Decl.) ¶ 5, ECF No. 14-3. SHSC expects to be assigned to Tier 3 for the performance cycle ending in 2026. *Id.* ¶ 10.
- Donor Network of Arizona (DNA) serves the state of Arizona. Declaration of Katharine Mills (Mills Decl.) ¶ 4, ECF No. 14-4. DNA expects to be assigned to Tier 2 for the performance cycle ending in 2026. *Id.* ¶ 14.

[2] After briefing on the instant cross-motions concluded, the Parties stipulated to the dismissal of a fourth Plaintiff, Gift of Life Michigan.

In December 2025, the Plaintiffs sued to stop CMS's 2020 Rule. *See* Compl., ECF No. 1. The operative Amended Complaint brings four claims under the APA. Am. Compl. ¶¶ 128–163. The Plaintiffs allege that CMS exceeded its statutory authority under 5 U.S.C. § 706(2)(C) by forcing OPOs to compete for certification (Count I), forcing OPOs to compete for DSAs (Count II), and attaching impermissible conditions to federal funds (Count III). Am. Compl. ¶¶ 128–150. In addition, the Plaintiffs allege that the 2020 Rule is arbitrary and capricious under 5 U.S.C. § 706(2)(A) (Count IV). Am. Compl. ¶¶ 151–163. In March 2026, the Plaintiffs moved for summary judgment, seeking to vacate the 2020 Rule. Pls.' Mot. Summ. J. (Pls.' Mot.), ECF No. 15. The Defendants then cross-moved for summary judgment. Defs.' Opp'n & Cross-Mot. Summ. J., (Defs.' Cross-Mot.), ECF No. 17. Both motions are now ripe for review.[3] *See* Pls.' Reply & Opp'n (Pls.' Opp'n), ECF No. 18; Defs.' Cross-Reply, ECF No. 21.

## LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In the context of an APA challenge, summary judgment "serves as a mechanism for deciding, as a matter of law, whether the administrative record supports the agency action and whether the agency action is consistent with the APA standard of review." *Int'l Swaps & Derivatives Ass'n v. U.S. Commodity Futures Trading Comm'n*, 887 F. Supp. 2d 259, 266 (D.D.C. 2012) (citing *Richards v. INS*, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977)).

[3] The Court notes that the Middle District of Florida recently addressed a similar challenge to the 2020 Rule and resolved the case in CMS's favor. *See LifeLink Found. v. Kennedy*, No. 8:25-cv-2042, 2026 WL 2914221 (M.D. Fla. Sep. 29, 2026).

## DISCUSSION

This opinion proceeds in three parts. First, the Court assesses whether the Medicare Act or the Certification Act requires the Plaintiffs to channel their claims to an administrative process before seeking judicial review. Next, the Court considers whether CMS exceeded its statutory authority in promulgating the 2020 Rule. Finally, the Court determines whether the rule is arbitrary or capricious. Ultimately, the Court concludes that it has jurisdiction to consider the Plaintiffs' claims, which fail on the merits.

### A. Claim Channeling

At the threshold, the Defendants argue that the Plaintiffs' challenge is premature. They first contend that the Medicare statute expressly requires the Plaintiffs to channel their claims through the agency. In the alternative, they argue that the Certification Act implicitly created a special statutory review scheme that the Plaintiffs must follow before bringing an APA challenge.[4] The Court disagrees with both arguments and finds that judicial review is available.

#### 1. Medicare Act

By statute, claims "arising under" the Medicare Act must first be channeled through the agency's administrative adjudicatory process before a plaintiff is entitled to judicial review. *See* 42 U.S.C. § 405(h); *see also id.* § 405(g); *id.* § 1395ii; *Am. Hosp. Ass'n v. Azar*, 895 F.3d 822, 825–26 (D.C. Cir. 2018) (explaining how these three provisions combine to require channeling under the Medicare Act). As the Supreme Court has explained, claims arise under the Medicare Act "where 'both the standing and the substantive basis for the presentation' of a claim is the Medicare Act[.]" *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 12 (2000)

[4] The Parties refer to 42 U.S.C. § 273 as the Certification Act. As explained above, Congress codified the Certification Act in 42 U.S.C. § 273(b)(1). But the Court follows the Parties' lead in referring to the changes to this subsection as the Certification Act.

(quoting *Heckler v. Ringer*, 466 U.S. 602, 615 (1984)). This may include, for example, "[c]laims for money, claims for other benefits, claims of program eligibility, and claims that contest a sanction or remedy" under the Medicare Act. *Id.* at 14.

Here, the Defendants argue that Section 405(h)'s claim channeling applies because the Medicare Act provides both the substantive basis and standing for the Plaintiffs' claims. *See* Defs.' Cross-Mot. at 19; Defs.' Cross-Reply at 1–2. They point out that the Plaintiffs challenge the Secretary's outcome performance standards, which the Plaintiffs must meet to maintain eligibility for Medicare funding. *See* 42 U.S.C. § 1320b-8(b)(1)(C), (F); 85 Fed. Reg. at 77,899. And they contend that the Plaintiffs' standing is partially rooted in the fact that they would lose Medicaid funding if they are decertified. *See* Pls.' Mot. at 15 (stating that decertification would "cut [them] off from being able to work with any hospital that wishes to receive federal funding" and they "simply could not survive" the attendant losses). According to the Defendants, whether this is described as a "claim[] of program eligibility" to Medicare or a "claim[] that contest[s] [the] sanction or remedy" of decertification or reassignment, it is one that Supreme Court precedent places in the agency's administrative review process in the first instance. Defs.' Cross-Mot. at 19 (quoting *Ill. Council*, 529 U.S. at 14). The Defendants are wrong for three reasons.

*First*, the substantive basis for this case is Section 273 of the Public Health Services Act, not the Medicare Act. The Plaintiffs' theory of the case "derive[s] from the fact that CMS has mandated competition between OPOs in violation of limited delegated authority under Section 273." Pls.' Mot. at 16 (citing Am. Compl. ¶¶ 136–163). Although this alleged competition may impact OPOs' eligibility for Medicare funding down the road, that downstream effect is not the "substantive basis" for the Plaintiffs' claims. *See Nat'l Infusion Ctr. Ass'n v. Becerra*, 116 F.4th 488, 505 (5th Cir. 2024) ("We cannot see how the Medicare Act could supply the substantive

basis for [the plaintiff's] challenges to the [statute] if those same challenges could be brought without reference to the Medicare Act."); *cf. Avon Nursing & Rehab. v. Becerra*, 995 F.3d 305, 312–13 (2d Cir. 2021) (holding that a challenge "independently rooted" in the Medicaid Act was not subject to channeling, even if it simultaneously arose under the Medicare Act). Rather than litigating any entitlement to Medicare funding, the Plaintiffs challenge the Secretary's authority under Section 273 of the Public Health Services Act to adopt the certification scheme.[5]

*Second*, and relatedly, even the relevant provision governing eligibility for Medicare funding, 42 U.S.C. § 1320b-8, is not in the Medicare Act. Section 1320b-8 is located in Subchapter XI of the Social Security Act, and the Medicare Act is located in Subchapter XVIII. Unlike some other provisions of Subchapter XI, Section 1320b-8 does not incorporate the claim channeling provision in Section 405(h). This is a hint that Congress did not intend to channel claims under this section. *See Regeneron Pharms., Inc. v. HHS*, 510 F. Supp. 3d 29, 43 (S.D.N.Y. 2020) (noting that, unlike Subchapter XVIII, Subchapter XI does not fully incorporate § 405(h)); *Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482, 491 (D. Md. 2020) (finding that Medicare Act channeling did not apply to other Subchapter XI claims).

[5] The Plaintiffs point out that their Amended Complaint does not cite the Medicare Act at all. Pls.' Mot. at 17. True, but that is not dispositive. *See Row 1 Inc. v. Becerra*, No. 22-cv-0718, 2023 WL 183687, at *2 (D.D.C. Jan. 12, 2023) (explaining that "the channeling requirement does not vary based on how a claim is characterized" (citing *Ill. Council*, 529 U.S. at 13–14)), *aff'd*, 92 F.4th 1138 (D.C. Cir. 2024). For example, a case that is "plainly about eligibility for reimbursement" under the Medicare Act must be channeled even if "the question turned on the interpretation of" a different statute. *Nat'l Infusion Ctr.*, 116 F.4th at 506; *see also Weinberger v. Salfi*, 422 U.S. 749, 760–61 (1975) (Medicare Act channeling applies to claims brought under the Constitution); *Cmty. Oncology All., Inc. v. OMB*, 987 F.3d 1137, 1142–43 (D.C. Cir. 2021) (Medicare Act channeling applies to a claim brought under the Balanced Budget and Emergency Deficit Control Act of 1985). But as explained, that is not the case here.

*Third*, the Plaintiffs' theory of standing is broader than a loss of Medicare payments.[6] For example, the Plaintiffs allege that they are "injured by the very prospect of having to compete for recertification and for their service areas." Pls.' Mot. at 14 (citing Glazier Decl. ¶¶ 13–15; DeStefano Decl. ¶¶ 12–14; Mills Decl. ¶¶ 15–17). Further, they allege that competition causes reputational harms and requires the Plaintiffs to expend resources that they would otherwise devote to their primary mission. *Id.* (citing Glazier Decl. ¶¶ 13–15; DeStefano Decl. ¶ 14; Mills Decl. ¶¶ 16–17); *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 417 (2021) (explaining that reputational harm is cognizable for standing); *People for the Ethical Treatment of Animals v. USDA*, 797 F.3d 1087, 1097 (D.C. Cir. 2015) (explaining that the expending of resources to counteract alleged unlawful conduct in this circumstance is cognizable for standing).[7]

For these reasons, the Court is satisfied that the Plaintiffs' claims are not subject to claim channeling under the Medicare Act.

**2. Certification Act**

In the alternative, the Defendants argue that "the Certification Act impliedly prohibits pre-enforcement review." Defs.' Cross-Mot. at 21; *see also* Defs.' Cross-Reply at 6. The Supreme Court has recognized that a "special statutory review scheme . . . may preclude district courts from

[6] The Court is satisfied that the Plaintiffs have Article III standing to bring this case, which the Defendants do not challenge. *See State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48, 53 (D.C. Cir. 2015) ("There is ordinarily little question that a regulated individual or entity has standing to challenge an allegedly illegal statute or rule under which it is regulated." (cleaned up)).

[7] In *Illinois Council*, the Supreme Court explained that Medicare Act channeling does not apply when it "would not simply channel review through the agency, but would mean no review at all." 529 U.S. at 19. Relying on this line of cases, the Plaintiffs argue that even if their claims arose under the Medicare Act, channeling would not apply because the 2020 Rule bars Tier 2 OPOs from appealing their non-renewal decisions, thus precluding ultimate judicial review for those Plaintiffs. The Court need not reach that argument given its holding that the Plaintiffs' claims do not arise under the Medicare Act.

exercising jurisdiction over challenges to federal agency action." *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 185 (2023) (citing *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994)). Congress may do so "explicitly, providing in so many words that district court jurisdiction will yield[,]" or "implicitly, by specifying a different method to resolve claims about agency action." *Id.* "Under *Thunder Basin*'s framework, courts determine that Congress intended that a litigant proceed exclusively through a statutory scheme of administrative and judicial review when (i) such intent is fairly discernible in the statutory scheme, and (ii) the litigant's claims are of the type Congress intended to be reviewed within [the] statutory structure." *Arch Coal, Inc. v. Acosta*, 888 F.3d 493, 498 (D.C. Cir. 2018) (cleaned up). The Supreme Court has provided three factors to guide the latter inquiry when a statutory scheme evinces Congressional intent to displace federal court jurisdiction: (1) whether "a finding of preclusion could foreclose all meaningful judicial review," (2) whether the claim is "wholly collateral to a statute's review provisions," and (3) whether the claim lies "outside the agency's expertise." *Thunder Basin*, 510 U.S. at 212–13 (cleaned up). Here, neither consideration supports the conclusion that Congress intended the Certification Act to supplant judicial review.

Starting with the first *Thunder Basin* inquiry, it is not "fairly discernable" in the Certification Act that Congress intended to provide an exclusive channel to administrative review. *Arch Coal, Inc.*, 888 F.3d at 498. Nothing in the Act even hints at such an intention. And the Defendants' briefing skips this part of the inquiry altogether, so they do not identify specific statutory language to advance their cause. *See* Defs.' Cross-Mot. at 21–23 (arguing only under the second *Thunder Basin* inquiry that Congress intended these claims to be reviewed within the Certification Act); Defs.' Cross-Reply at 6–7 (same). Reading between the lines, the Defendants seem to rely on the provision referencing administrative appeals of decertification decisions.

42 U.S.C. § 273(b)(1)(D)(ii)(IV) (stating that the certification process should "provide for a qualified [OPO] to appeal a decertification to the Secretary on substantive and procedural grounds"). But that statutory provision neither clarifies the specifics of the appeal process, nor does it reference judicial review at all. *United States v. Fausto*, 484 U.S. 439, 443, 455 (1988); *see also Axon*, 598 U.S. at 185 (explaining that Congress "typically chooses" to preclude district court review by establishing an agency review process followed by "review in a court of appeals"). And in any event, an appeals process for certification decisions does not reflect Congressional intent to generally displace judicial review of other challenges like the one before the Court. Indeed, it is a far cry from the statutory schemes that the Supreme Court has blessed in the past. *See, e.g.*, *Thunder Basin*, 510 U.S. at 207 (describing a complex statutory scheme with deadlines to challenge agency action, processes for appellate review, and more).

Even if the Defendants were correct about the first *Thunder Basin* prong, the Plaintiffs' claims are not "of the type Congress intended to be reviewed within the statutory structure" under the second. *Arch Coal, Inc.*, 888 F.3d at 498 (cleaned up). The Court must consider whether (1) preclusion of the Plaintiffs' claims could "foreclose all meaningful judicial review," (2) the Plaintiffs' claims are "wholly collateral" to the Certification Act's review provisions, and (3) the Plaintiffs' claims are "beyond the expertise of the agency." *Arch Coal, Inc*, 888 F.3d at 500 (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010)). If "the answer to all three questions is yes," the Court "presume[s] that Congress does not intend to limit jurisdiction." *Axon*, 598 U.S. at 186 (quoting *Free Enter. Fund*, 561 U.S. at 489). "But the same conclusion might follow if the factors point in different directions." *Id.*

Starting in reverse with the third consideration, whatever expertise that CMS might possess with respect to OPO certification within the organ transplantation scheme, the Plaintiffs' APA

claims belong "squarely within the judicial ken." *Vape Cent. Grp., LLC v. FDA*, No. 24-cv-3354, 2025 WL 637416, at *8 (D.D.C. Feb. 27, 2025); *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400–01 (2024) ("[A]gencies have no special competence in resolving statutory ambiguities. Courts do."). On the second, the Plaintiffs' claims are collateral to the Certification Act's review provision; they challenge the 2020 Rule, not any decertification decision. The Defendants contend otherwise, pointing out that the Certification Act established an "expedited administrative appeals process" regarding recertification that would be superfluous if OPOs first sought judicial review. Defs.' Cross-Mot. at 22. But nothing about this action challenging the Secretary's authority under Section 273 renders any proceedings regarding decertification superfluous. Finally, the first consideration is closer. It is not clear that a finding of preclusion would foreclose all meaningful judicial review given the administrative appeals process. But even the Defendants seem to acknowledge that "some issues might not be addressed by the agency itself in an adjudication." Defs.' Cross-Mot. at 23. In the end, the Court need not decisively resolve the first consideration because all three need not point in the same direction: "The ultimate question is how best to understand what Congress has done—whether the statutory review scheme, though exclusive where it applies, reaches the claim in question." *Axon*, 598 U.S. at 186 (cleaned up). Collectively, the three considerations point against a limitation on judicial review. And, as discussed above, the first *Thunder Basin* inquiry already falls decisively against the Defendant. So the Court declines to yield its jurisdiction on the basis of the Certification Act.

* * *

In the end, the Court is mindful that "[t]he APA . . . creates a 'presumption favoring judicial review of administrative action[.]'" *Sackett v. EPA*, 566 U.S. 120, 128 (2012) (quoting *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984)). Here, Congress expressed no intent in the

Certification Act to upset that presumption and preclude the Plaintiffs' claims. Because neither Medicare Act channeling nor the Certification Act bars immediate judicial review, the Court will proceed to the merits.

**B. Statutory Authority**

On the merits, the Plaintiffs first argue that the 2020 Rule exceeds the statutory authority set out in Section 273. "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority." *Loper Bright*, 603 U.S. at 412. In some instances, "the statute's meaning may well be that the agency is authorized to exercise a degree of discretion." *Id.* at 394. For example, a statute may "expressly delegate to an agency the authority" to define a particular term, "empower an agency" to "fill up the details" of a statute, or "regulate subject to the limits imposed by a term or phrase." *Id.* at 394–95 (cleaned up). In such a case, "the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits." *Id.* at 395. The Court must do so by "recognizing constitutional delegations, fixing the boundaries of the delegated authority, and ensuring the agency has engaged in reasoned decisionmaking within those boundaries." *Id.* (cleaned up).

Here, Section 273 twice delegates express discretionary authority regarding OPOs to the HHS Secretary. *See* 42 U.S.C. § 273(b)(1) (defining a qualified OPO as "an organization which, *as determined by the Secretary*, will carry out the functions described" elsewhere in Section 273) (emphasis added); 42 U.S.C. § 273(b)(1)(D)(ii) (stating that the process to determine OPOs' compliance with performance measures is to be "defined through regulations *that are promulgated by the Secretary*") (emphasis added); *see also Children's Hosp. Ass'n of Tex. v. Azar*, 933 F.3d 764, 770 (D.C. Cir. 2019) (explaining that an "as determined by the Secretary" clause qualifies as

an express delegation). And the Defendants contend that the 2020 Rule is well within the confines of this delegated statutory authority.

The Plaintiffs see it differently. In urging the Court to set aside the 2020 Rule, the Plaintiffs argue that the agency exceeded its delegated authority by: (1) forcing OPOs to compete for certification, (2) forcing OPOs to compete for DSAs, and (3) attaching impermissible conditions to federal funding. The Court takes these arguments in turn, concluding that the agency acted within the bounds of its delegated authority in promulgating the 2020 Rule.

**1. Competition for Certification**

First, the Plaintiffs argue that CMS exceeded its statutory authority by requiring them to compete for certification. As the Plaintiffs put it, "[n]o language in Section 273 authorizes the Secretary to implement *comparative* performance measures, to require competition amongst OPOs, or to dangle certification as a zero-sum benefit doled out to only a portion of OPOs." Pls.' Mot. at 19. Curiously, the Plaintiffs characterize the certification scheme as "zero-sum," *id.*, or, more colorfully, as a "Hunger Games competition," *id.* at 27. The Plaintiffs are wrong. Under the 2020 Rule, no OPO's recertification depends on another OPO being decertified. Rather, the tiered threshold rates are based on data from the prior year, such that all OPOs can meet the required floor. 85 Fed. Reg. at 77,913. Further, the 2020 Rule employs confidence intervals to rank the OPOs into each tier, which allows OPOs to cluster near the top.[8] *Id.* As CMS emphasized in its final rule, "[we] want to reassure the public that our goal is to improve oversight of OPOs by

---

[8] This is also a reason why CMS disagreed with comments suggesting that it calculate OPO performance measures via the standard deviation from the mean methodology. *See* 85 Fed. Reg. at 77,913. As CMS explained, under those commenters' preferred methodology, "there will always be an OPO below the targeted standard deviation from the mean, meaning that not all OPOs would have the opportunity to be a top performing OPO unless they all had identical rates." *Id.* The methodology incorporated into the 2020 Rule is intentionally *less* competitive, since using confidence intervals based on medians allows OPOs to "cluster at the top." *Id.*

reducing the variability in performance among OPOs and in the DSAs, not necessarily reducing the number of OPOs or forcing consolidation." *Id.* The Plaintiffs counter that CMS's goal in promulgating the 2020 Rule was increasing competition, pointing to CMS's own estimates that nearly 40% of OPOs would be eliminated under the new scheme. *See* Pls.' Opp'n at 9 (stating that the certification scheme bears "all the hallmarks of an overtly competitive process"). To be sure, more OPOs will almost certainly be decertified than in prior years, and the certification process is designed to incentivize better performance. But this does not mean that the system is zero-sum.

Regardless of whether certification is zero-sum, the Plaintiffs claim that CMS exceeded the outer bounds of its authority by predicating certification on comparative performance measures, which they describe as impermissibly competitive. Pls.' Mot. at 19–23. Recall that the 2020 Rule calculates an OPO's donation and transplantation rates based on data from their particular service area. *See* 42 C.F.R. § 486.318(d). Then, using those metrics, CMS will sort OPOs into three tiers based on how their outcome metrics compare to threshold rates set by OPOs from the prior year, with the tiers determining whether OPOs are recertified. *See* 42 C.F.R. § 486.318(e). The Plaintiffs take issue with the second step, arguing that it exceeds the authority delegated to the Secretary in Section 273. They point to one phrase in Section 273, which states that in establishing a certification process, the Secretary must "rely on outcome and process performance measures that are based on empirical evidence, obtained through reasonable efforts, of organ donor potential and other related factors *in each service area* of qualified organ procurement organizations[.]" 42 U.S.C. § 273(b)(1)(D)(ii)(II) (emphasis added). They stress that if the statute requires outcome metrics to be based on evidence *in each service area*, CMS necessarily cannot base certification decisions on evidence *across* DSAs or OPOs. Pls.' Mot. at 19.

The Court disagrees. The Final Rule *does* base both outcome measures on evidence from each service area. Specifically, donation rates and transplantation rates are both calculated using data from the OPO's specific DSA. *See* 42 C.F.R. § 486.318(d)(1)(iii) (defining the numerators for each metric as the number of donors or transplanted organs "in the DSA"); *id.* § 486.318(d)(1)(iv) (defining the denominator for both metrics as certain deaths "within the DSA"). The Secretary then compares the metrics across OPOs as part of the certification process. Thus, the statute sets the boundaries of what data the Secretary must use in determining outcome measures, but it leaves to the Secretary the decision of how to use that data. *Cf. Sierra Club v. E.P.A.*, 325 F.3d 374, 377 (D.C. Cir. 2003) (indicating that a statutory mandate for a rule to be "based on" a study does not mean that the rule "must be based *exclusively* on the study"). Indeed, the statute explicitly delegates to the Secretary the task of promulgating regulations regarding how to use outcome measures in making certification decisions. *See* 42 U.S.C. § 273(b)(1)(D)(ii).

Contrary to the Plaintiffs' argument, this reading of Section 273 does not render the "in each service area" modifier superfluous. Pls.' Mot. at 20. Again, the 2020 Rule calculates donation rates and transplantation rates by service area. This addresses the purpose of Section 273's "in each service area" language: stopping CMS's "exclusive reliance on population-based measures of performance that [did] not account for the potential in the population for organ donation and do not permit consideration of other outcome and process standards that would more accurately reflect the relative capability and performance of each [OPO]." Pub. L. No. 106-505, 114 Stat. 2314, 2346 (codified at 42 U.S.C. § 273 note).[9]

[9] The Plaintiffs agree that Congress used this language to stop the "exclusive reliance on population-based measures of performance[.]" 114 Stat. at 2346. But they argue that Congress achieved its goal by requiring CMS to look at "donor potential and other related factors." 42 U.S.C. § 273(b)(1)(D)(ii)(II). This slices the statutory language far too thin. Calculating donor potential and other related factors in each DSA furthers Congress's goal of moving away from exclusively

The Plaintiffs also retreat to Section 273's history and purpose to argue that Congress never intended CMS to employ a competitive certification process. *See* Pls.' Mot. at 21–22. They insist that "[i]nsulating OPOs from competition was a central element of Congress's statutory design." Pls.' Mot. at 21. But the logic of the Plaintiffs' argument extends even further, implying that Section 273 bars both competition *and* decertification. *See, e.g.*, *id.* at 21 (arguing that reducing the number of OPOs would undermine Congress's "system of geographic exclusivity" that fostered "lasting and stable relationships between OPOs" and their DSAs); *id.* at 22 (suggesting that the Secretary lacks the ability to add new OPOs).[10] To be sure, Section 273 includes elements designed to ensure geographic exclusivity and close connections between OPOs and their DSAs. *See* 42 U.S.C. § 1320b-8(b)(2); *id.* § 1320b-8(a)(1)(C). But this does not mean that Congress intended to insulate OPOs from competition altogether or expected that an OPO would hold claim to its DSA in perpetuity. Otherwise, Congress would not have required that the Secretary mandate recertification, which occurs every four years. *See* 42 U.S.C. § 273(b)(1)(D)(ii)(I); 71 Fed. Reg. at 30,992. In other words, geographic exclusivity does not preclude accountability. To the contrary, the purpose of the Certification Act was to improve the "effectiveness of organ

---

population-based performance measures. And even further, the Secretary's cross-OPO comparisons fulfill Congress's additional goal to "more accurately reflect the *relative* capability and performance of each [OPO]." 114 Stat. at 2346 (emphasis added).

[10] On this last point, CMS has historically taken the position that it lacks authority to add new OPOs. *See* 85 Fed. Reg. at 77,898; 70 Fed. Reg. 6,086, 6,091 (Feb. 4, 2005). CMS's briefing retreats from that position, arguing that it "does not intend to interpret the statute in that way in the future." Defs.' Cross-Mot. at 29. It also points to more recent proposed rulemaking that reflects its change of thinking. *See* 91 Fed. Reg. 4,190, 4,191 (Jan. 30, 2026). The Parties acknowledge that the rulemaking process remains ongoing and urge the Court not to await a new final rule. *See* Joint Notice, ECF No. 25. But either way, whether CMS can *add* new OPOs does not shed much light on its powers to certify existing OPOs. And the text, history, and purpose of the Certification Act do not support the OPOs' core argument that Congress intended to insulate OPOs from competition altogether during the certification process.

procurement organizations in raising the level of organ donation." Certification Act § 701(b)(2), 144 Stat. at 2346. The 2020 Rule fits comfortably within the boundaries that Congress set in service of that goal.[11]

In sum, whether categorized as competition or not, the 2020 Rule does not exceed the "outer statutory boundaries" in the Certification Act. *Loper Bright*, 603 U.S. at 404. Congress awarded the Secretary discretion to fashion a certification process that relied on outcome measures tied to each service area, and HHS has done so. And the statute does not altogether foreclose competition or cross-OPO comparisons. Thus, on this point, the Court finds that the agency acted within its statutory authority.

**2. Competition for Service Areas**

Next, the Plaintiffs argue that CMS lacks authority to force Tier 2 OPOs to compete to retain their DSAs after being neither recertified nor decertified. Pls.' Mot. at 23–27. They claim that "[b]y directing the agency to verify OPOs' compliance" with the statutory criteria of having a sufficiently-sized DSA, "Congress made clear that the Secretary was without authority to define an OPO's region in the first instance." Pls.' Mot. at 23 (discussing 42 U.S.C. § 273(b)(1)(E), (2)(A)). But the 2020 Rule does not define an OPO's region or DSA. Rather, it provides a process

[11] Past practice strengthens CMS's claim of statutory authority. As CMS points out, the 1996 and 2006 outcome measures both compared OPOs' performances to one another. See 61 Fed. Reg. 19,722, 19,744 (May 2, 1996) (requiring OPOs achieve at least 75 percent of the national mean across four of five categories); 71 Fed. Reg. at 31,050 (requiring two of the outcome measures not to exceed a certain number of standard deviations below the national mean). Yet Congress did not disapprove of those processes when it passed the Certification Act. *See Loper Bright*, 603 U.S. at 386 (suggesting that the government's longstanding practice can inform the Court's determination as an "interpretive aid"). The Plaintiffs argue that because these prior measures "tested whether OPOs were within a certain range of a national average," they did "not rank OPOs against each other or make certification available to only a defined percentage of top performers." Pls.' Opp'n at 13. But critically, they do not dispute that those measures employed a comparative (and thus, in their framing, competitive) analysis.

for certifying OPOs based on outcome and process performance measures, as mandated by the statute. *See* 42 U.S.C. § 273(b)(1)(D). And when a Tier 2 OPO fails to meet the requisite outcome and process performance measures, CMS may identify whether that OPO or a different one is best suited to continue operating the DSA.

Relying on past agency practice, the Plaintiffs argue that CMS may not open an existing DSA to competition *before* decertifying that OPO. Pls.' Mot. at 23–24 (discussing 42 C.F.R. § 486.308). Critically, though, the Plaintiffs do not dispute that CMS has the authority to open a DSA to competition once its incumbent OPO is decertified, lest a DSA go completely unserved. *See* 42 U.S.C. § 1320b-8(b)(2) ("The Secretary may not designate more than one [OPO] for each service area[.]"); 42 C.F.R. § 486.316 (setting out the criteria for competition and selection); 71 Fed. Reg. at 30,996–99 (discussing the competition procedures established during the 2006 rulemaking process). Given that the statute allows for competition over a DSA when an OPO is decertified, it follows that CMS may allow for competition over a DSA where an incumbent Tier 2 OPO is not recertified. In this way, rather than "fashion[ing] an elaborate competition process for service areas out of whole cloth," Pls.' Opp'n at 14, CMS is simply applying its unchallenged authority for decertified OPOs to non-renewed Tier 2 OPOs. In opposition, the Plaintiffs point out that the statute includes a detailed waiver process for hospitals to work with an OPO outside their DSA. *See* 42 U.S.C. § 1320b-8(a)(2). But the hospital waiver process is unrelated to the OPO certification process. No one disputes that Congress bound CMS's discretion in resolving disputes over hospitals, but the hospital waiver process says nothing about whether CMS can open DSAs to competition through the certification process.

Finally, the Plaintiffs argue that opening the DSAs of Tier 2 OPOs to competition undermines the scheme that Congress set out for appeals. Section 273 permits OPOs "to appeal a

decertification to the Secretary on substantive and procedural grounds[.]" 42 U.S.C. § 273(b)(1)(D)(ii)(IV). But because Tier 2 OPOs receive "non-renewal" decisions (instead of decertification) if they lose their DSAs, they may not appeal those decisions to the Secretary. *See* 85 Fed. Reg. at 77,918 (explaining that a non-renewal is not a decertification). The Plaintiffs argue that such a loss "is functionally equivalent to a [de]certification." Pls.' Opp'n at 15. And they say that "the fact that Congress specifically instructed CMS to provide due process for OPOs for [de]certification *but not* for loss of a service area is strong indication that Congress did not envision a competition for service areas that precedes or even occurs simultaneously with [de]certification." *Id.* But the Plaintiffs' underlying premise is incorrect. Non-renewed Tier 2 OPOs are not equivalent to decertified Tier 3 OPOs, because these Tier 2 OPOs can still compete to retain their DSAs. And the Plaintiffs do not dispute the seemingly longstanding practice that OPOs are not entitled to an appeal if they are not awarded an open service area. *See* 71 Fed. Reg. at 30,998 (explaining why the 2006 Rule did not offer appeal rights to OPOs not awarded an open DSA). Further, nothing in the 2020 Rule precludes CMS from allowing a Tier 2 OPO that is initially non-renewed to be recertified (meaning that the OPO would have no need to appeal) or decertified (meaning that the OPO would gain appeal rights) during the subsequent cycle.[12]

### 3. Spending Clause

In a last-ditch attempt to set aside the 2020 Rule, the Plaintiffs argue that it raises constitutional questions under the Spending Clause. *See* Pls.' Mot. at 26–27. Under the Spending Clause, when "'Congress intends to impose a condition on the grant of federal moneys, it must do

[12] CMS recently proposed a rule permitting the recertification of Tier 2 OPOs even if they lose their service area. *See* 91 Fed. Reg. at 4,210. Under that proposed rule, if a recertified Tier 2 OPO without a DSA does not obtain a new DSA during the next cycle, it will be decertified and entitled to appeal that decision. *Id.* at 4,209.

so unambiguously.'" *Nat'l Fed'n of Indep. Bus. v. Sebelius* (*NFIB*), 567 U.S. 519, 583 (2012) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). It also may not "surpris[e] participating States with post-acceptance or retroactive conditions" that impose a "major change in a program" *Id.* at 584–85 (cleaned up). Here, the Plaintiffs contend that they were not on notice that they could be forced to compete against other OPOs to continue receiving federal funding. *See* Pls.' Mot. at 26–27; Pls.' Opp'n at 16. Invoking principles of constitutional avoidance, they argue that the Spending Clause offers an additional reason to set aside the 2020 Rule. *See* Pls.' Mot. at 26; Pls.' Opp'n at 16–17; *see also Clark v. Martinez*, 543 U.S. 371, 380–81 (2005) (explaining that principles of constitutional avoidance counsel against reading a statute in a way that would raise constitutional issues). The Court is not convinced.

At the outset, the Court doubts that the 2020 Rule makes "retroactive" changes within the meaning of the Spending Clause. *NFIB*, 567 U.S. at 584 (quoting *Pennhurst*, 451 U.S. at 25). Certification occurs on a four-year cycle, *see* 42 C.F.R. § 486.308, and the 2020 Rule only impacts prospective cycles and therefore prospective funding. In *NFIB*, for example, the Supreme Court stated that Congress may not "penalize States that choose not to participate in [a] new program by taking away their *existing* . . . funding." *NFIB*, 567 U.S. at 585 (emphasis added). But as the Court made clear, nothing stops the government from conditioning *future* funds on new conditions. *See id.* (explaining that "[n]othing in [the] opinion precludes Congress from offering funds under the Affordable Care Act to expand the availability of health care, and requiring that States accepting such funds comply with the conditions on their use"). In the same sense, because OPOs' entitlement to federal funding only lasts as long as their certification cycle, changes to prospective certification cycles are not an impermissibly retroactive "surpris[e]." *Id.*

Furthermore, the 2020 Rule "can hardly be described as a major change" to the system governing OPOs. *NFIB*, 567 U.S. at 585. At a high level, the statute makes clear that OPOs must remain certified and meet certain outcome and process metrics to remain eligible for Medicare reimbursement. While the 2020 Rule makes changes to the certification process—as CMS is well within its rights to do—those changes are comparable to existing elements of the regulatory scheme, such as the use of comparative metrics, *see* 61 Fed. Reg. at 19,744, and competitions for open DSAs, *see* 71 Fed. Reg. at 30,996–99; *see also NFIB*, 567 U.S. at 583 (focusing on whether the change "accomplishes a shift in kind, not merely degree"). The Plaintiffs continue to characterize the 2020 Rule as inventing a novel zero-sum competition scheme that is divorced from the statute. But as explained above, CMS has merely exercised its statutory authority to change the certification process to better incentivize OPOs to meet ambitious outcome measurements. And the statute does not insulate OPOs from all competition in the certification process. Given the bounds of the Secretary's authority under Section 273, the Plaintiffs were on notice that the certification requirements could change in the ways reflected in the 2020 Rule.

**C. Arbitrary and Capricious**

Finally, the Plaintiffs argue that the 2020 Rule is arbitrary and capricious under the APA, 5 U.SC. § 706(2)(A). Pls.' Mot. at 31–37. "The APA's arbitrary-and-capricious standard requires that agency rules be reasonable and reasonably explained." *Nat'l Tel. Coop. Ass'n v. FCC*, 563 F.3d 536, 540 (D.C. Cir. 2009). For example, agency action is arbitrary and capricious

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). That said, "[t]he scope of this review 'is narrow,' and reviewing courts must exercise appropriate deference to agency decisionmaking and not substitute their own judgment for that of the agency." *FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 567 (2025) (quoting *State Farm*, 463 U.S. at 43). A court's role is "simply [to] ensure[] that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

The Plaintiffs argue that CMS made three choices in the 2020 Rule that are neither reasonable nor reasonably explained. They claim that CMS: (1) failed to justify its use of data that depend on factors outside OPOs' control, Pls.' Mot. at 28–31, (2) ignored evidence showing that its methodology employing confidence intervals privileged some OPOs over others, Pls.' Mot. at 31–33, and (3) failed to justify its "disruptive" 25% threshold for certification, Pls.' Mot. at 33–36. Having carefully considered these arguments, and mindful of its "highly deferential" role in APA cases, *Nat'l Tel. Coop. Ass'n*, 563 F.3d at 541, the Court finds that the 2020 Rule is not arbitrary and capricious.

### 1. Data Selection

The Plaintiffs first take issue with CMS's use of certain data to calculate outcome metrics that turn on factors outside OPOs' control.[13] They make three broad arguments on this score: (1) that MCOD data is overinclusive and unreliable, (2) that CMS did not justify its use of 12 months of data for certification decisions, and (3) that CMS's outcome measures do not account

[13] The OPOs also state that the outcome measures "functionally disregard OPO performance on process measures[.]" Pls.' Mot. at 28; *see also* Pls.' Opp'n at 17 (claiming that "CMS has nothing to say" on this point). But the OPOs themselves never explain how the outcome measures render the process measures obsolete.

for demographic and geographic variations across OPOs and DSAs. As to each, the Court finds that CMS "reasonably considered the relevant issues and reasonably explained the decision." *Prometheus Radio Project*, 592 U.S. at 423.

*First*, the Plaintiffs allege that CMS's use of MCOD data is overinclusive and unreliable. Pls.' Mot. at 28–29. Recall that the 2020 Rule calculates both the donation rate and transplantation rate using the same underlying denominator—donor potential—which is "based on inpatient deaths within the DSA from patients 75 or younger with a primary cause of death that is consistent with organ donation." 42 C.F.R. § 486.318(d)(1)(iv). CMS computes donor potential using data "obtained from the most recent 12–months [of] data from state death certificates," *id.*, sourced from the CDC's MCOD file, which is a publicly-available data set of county-level mortality data that includes a record for every death of a United States resident recorded in the country, 85 Fed. Reg. at 77,906.

The Plaintiffs argue that MCOD data is overinclusive. As commenters highlighted during the rulemaking process, MCOD data includes the deaths of patients ineligible for donation, like patients who did not die on a ventilator, which is required for organ donation, or those with secondary diagnoses that prevent donation. *See* RR 186, RR 809, RR 1494, RR 2279. The Plaintiffs thus fear that they will be inappropriately evaluated "based on deaths that could have never resulted in an organ donor or transplant." Pls.' Opp'n 18. The Plaintiffs also claim that MCOD data is unreliable. As CMS acknowledged, "several commenters referenced literature that found error rates of the death certificates ranging from 30 to 60 percent. In addition, numerous commenters from the medical examiner/coroner community questioned the accuracy of the death certificates." 85 Fed. Reg. at 77,906.

Despite its shortcomings, CMS has a reasonable explanation for using MCOD data. CMS explained that MCOD data is superior to its prior metric, which measured donors per "eligible death[.]" 71 Fed. Reg. at 31,050. The "eligible death" metric was *under*inclusive—as CMS explained in its proposed rule, stakeholders in the community "increasingly . . . brought to [CMS's] attention that the interpretation of eligible deaths appear[ed] to be inconsistent across [DSAs], and that all OPO data is unaudited and self-reported and therefore, the accuracy and consistency of that data cannot be assured." 84 Fed. Reg. at 70,630 (cleaned up). For example, that metric "allow[ed] OPOs to exclude from the calculated potential donor pool those cases where the next-of-kin did not authorize donation"—a task on which CMS emphasized that OPOs should improve. 85 Fed. Reg. at 77,929. CMS also explained why MCOD data is preferable to the eligible death data. For example, CMS cited a peer-reviewed study supporting its use of death certificate data as "the best and most comprehensive source for estimating the donor potential at this time." 85 Fed. Reg. at 77,906 (citing RR 2578−87).[14] This is partially because, as the 2020 Rule explained, there appears to be no research showing "differences in the error rates that would disadvantage one DSA over another DSA." *Id.* In other words, while error rates may be high, they seem to be evenly distributed across DSAs and "likely plague other potential data sources" in similar ways. *Id.*

Therefore, contrary to the Plaintiffs' claims, CMS's justifications for using MCOD data instead of self-reported eligible deaths do not "disregard contrary or inconvenient factual determinations that it made in the past[.]" *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 537 (2009)

[14] The OPOs criticize this study, claiming that it evaluated different metrics than those adopted in the 2020 Rule. *See* Pls.' Opp'n at 21 n.7. But this Court must be "particularly deferential" to the agency's analysis in a case like this, which implicates the agency's "technical expertise[.]" *AD HOC Telecomms. Users Comm. v. FCC*, 572 F.3d 903, 908 (D.C. Cir. 2009).

(Kennedy, J., concurring). Rather, CMS has shown that "'there are good reasons' for the new position" that the eligible death metric is flawed, "and that 'the agency *believes*' the new position to be 'better.'" *CBOE Glob. Markets, Inc. v. SEC*, 155 F.4th 704, 716 (D.C. Cir. 2025) (quoting *Fox TV Stations*, 556 U.S. at 515)).

Importantly, CMS also explained that it considered alternative data sources, but that none were obtainable through "reasonable efforts." 85 Fed. Reg. at 77,907 ("Although commenters expressed concerns with our use of the MCOD, they did not suggest a different source of empirical evidence that could be obtained without undue reporting burden and was of greater accuracy."); *see also* 42 U.S.C. § 273(b)(1)(D)(ii)(II) (requiring only that these metrics be "obtained through reasonable efforts"). The Plaintiffs lament that CMS did not adopt specific alternatives raised by commenters, such as "data from electronic health records, hospital chart reviews, insurance billing codes, or hospital reported data of ventilated neurological deaths." Pls.' Opp'n at 20. But CMS explicitly acknowledged these alternative sources, explained why it believed them to be inadequate, and committed to "continue to evaluate the benefit and applicability of future data sources as they become available." 85 Fed. Reg. at 77,907. This clears the bar under APA review.

In sum, CMS provided detailed explanations for its use of MCOD data. It acknowledged the shortcomings of the prior metric, 84 Fed. Reg. at 70,630, cited stakeholders' concerns and a relevant study, *id.*; 85 Fed. Reg. at 77,929 (citing RR 2578–87), and explained why no alternative data sources could be obtained through reasonable efforts, 85 Fed. Reg. at 77,907. As a result, the Court is satisfied that CMS "reasonably considered the relevant issues and reasonably explained the decision" at issue. *Prometheus Radio Project*, 592 U.S. at 423 (2021).

*Second*, the Plaintiffs claim that CMS did not sufficiently justify using a single year of data from the four-year cycle to make certification decisions. *See* Pls.' Mot. at 29. But the record does

not bear that out. *See* 85 Fed. Reg. at 77,915. It demonstrates that using more recent data can better measure current performance. For example, CMS sought to reward OPOs for making improvements instead of masking their performance with old data, including for OPOs taking over a DSA from a poorly performing predecessor. *Id.* CMS acknowledged that data reporting may "lag," but explained that the data remained the "best information available to empirically and transparently evaluate the [OPOs'] performance." 85 Fed. Reg. at 77,916. CMS also addressed concerns raised by OPOs during rulemaking that this shorter timeframe could lead to more variance. 85 Fed. Reg. at 77,915. Namely, the 2020 Rule incorporated statistical confidence intervals to reduce data variability, and it allowed OPOs to seek a one-year extension in extenuating circumstances, such as when a natural disaster, public health emergency, or data transmission error would disproportionately affect an OPO. *Id.* These justifications also preclude a finding that the 12-month timeline is arbitrary and capricious.

*Third*, the Plaintiffs claim that the outcome measures do not account for demographic and geographic variations across OPOs and DSAs. For example, commenters highlighted that OPOs who operate in more privileged, homogenous, and densely populated areas will more easily meet the donation and transplantation rate thresholds. *See* Pls.' Mot. at 29–30 (collecting comments). But CMS recognized that its measures "do not control for every variable that can affect OPO performance for reasons beyond its control." 85 Fed. Reg. at 77,929. And the 2020 Rule addressed the pros and cons of making risk adjustments—not just for race, but for chronic disease, gender, age, and ventilator status. *See* 85 Fed. Reg. at 77,909–10. Though CMS declined to make risk adjustments for many of these factors, it reasonably agreed to risk-adjust for age. *Id.* at 77,910–11.

In response, the Plaintiffs point out that CMS recently proposed making risk adjustments for many of these characteristics while measuring transplant hospitals. Pls.' Mot. at 30–31. But as even the Plaintiffs recognized, that rule had different goals. *See* Pls.' Opp'n at 23. Here, CMS proactively sought and carefully responded to comments considering whether to risk adjust for "donor demographic characteristics" and "DSA characteristics" in a way that would be "significant and clinically appropriate[.]" 85 Fed. Reg. at 77,909. Though the Plaintiffs may disagree with CMS's conclusions, the agency undoubtedly acted within the "zone of reasonableness" in deciding that additional risk adjustments would not be helpful. *Prometheus Radio Project*, 592 U.S. at 423.

**2. Confidence Intervals**

Next, the Plaintiffs argue that CMS ignored evidence showing that its methodology systematically privileges OPOs working in smaller DSAs. *See* Pls.' Mot. at 31–33. As discussed, the 2020 Rule sorts OPOs into tiers based on the upper limit of the 95% confidence interval for their donation and organ transplantation rates. 42 C.F.R. § 486.318(e). The Plaintiffs contend that OPOs with smaller population sizes get an "unfair boost in the competition" because they have larger confidence intervals. Pls.' Mot. at 32. Whether or not the Plaintiffs' underlying assumptions are correct, *see* Defs.' Cross-Mot. at 34 (arguing that the Plaintiffs have a "fundamental misunderstanding of confidence intervals"), the Defendants' use of confidence intervals is eminently reasonable. Confidence intervals simply ensure that OPOs are placed into tiers based on data that is statistically significant. In fact, these confidence intervals also ameliorate concerns that the Plaintiffs raise elsewhere—that analyzing only a single year of data could harm outlier OPOs. *See* Pls.' Mot. at 29. As CMS clearly explained in the 2020 Rule, its use of confidence intervals does not *create* bias, it just accounts for less variation from chance due to a larger data set. *See* 85 Fed. Reg. at 77,914. And without confidence intervals, OPOs operating in *less* populous DSAs

could be treated unfairly, given that their smaller data sets are subject to larger fluctuations. In sum, because CMS reasonably justified its use of confidence intervals, the Plaintiffs' arbitrary and capricious challenge on this point also fails.

**3. Certification Thresholds**

Finally, the Plaintiffs contend that CMS's decision to only recertify OPOs above the 25% threshold for outcome measurements is arbitrary and capricious for two reasons: (1) the agency arbitrarily selected 25% as the threshold, and (2) the agency did not adequately consider how the cutoff would disrupt the nation's organ donation system. *See* Pls.' Mot. at 33–36. Again, the Court disagrees.

*First*, CMS sufficiently explained why it required OPOs seeking recertification to meet the 25% threshold for outcome measurements. "When, as here, the [agency] must select some, necessarily somewhat arbitrary figure, [the Court] will defer to the [agency's] expertise if it provides substantial evidence to support its choice and responds to substantial criticisms of that figure." *United Distrib. Cos. v. FERC*, 88 F.3d 1105, 1141 n.45 (D.C. Cir. 1996). CMS has done just that. As it explained, the threshold "was chosen to mathematically achieve the Secretary's goal of doubling kidney transplants by 2030. It was also chosen because, when [the agency] assessed which OPOs were top performing, [it] found that that threshold rate of 25 percent provided [it] a diversity of OPOs serving a range of geographic areas and different donor potentials." 85 Fed. Reg. at 77,913; s*ee also* 84 Fed. Reg. at 70,634, 70,656–57 (explaining the ambitious steps required to reach the goal of doubling kidney transplants by 2030). Though CMS acknowledged that its threshold rates were "aggressive"—something some commenters notably supported—that does not make them inherently unreasonable. 85 Fed. Reg. at 77,911. And although "the U.S.

organ procurement system has one of the highest donation rates *worldwide*," Pls.' Mot. at 33, that does not make it unreasonable for CMS to press for further improvements to the system.

Two additional points are worth mentioning. CMS did consider alternative thresholds—such as the median or the geometric mean—but decided that those would not adequately incentivize OPOs to maintain or improve their performance. *See* 85 Fed. Reg. at 77,911. And CMS implemented the tiered system in response to commenters' concerns about the threshold rate. *Id.* ("We also recognize that if we set a threshold rate too difficult to attain, we risked incentivizing poorer performing OPOs to not strive to improve while remaining certified for a full 4-year cycle. Therefore, we are modifying our proposal and finalizing a 3-tier system[.]"). This does not mean that the 25% threshold was unreasonable all along, as the Plaintiffs' claim, *see* Pls.' Opp'n 25; rather, it demonstrates that CMS laudably engaged in the deliberative process that notice and comment rulemaking requires.

*Second*, the Plaintiffs argue that CMS did not sufficiently consider the practical consequences of its aggressive cutoff. To be sure, CMS acknowledged that its cutoffs could reduce the number of OPOs. The agency's initial estimates showed that only 36 OPOs would service the 58 DSAs after the first certification cycle. 85 Fed. Reg. at 77,913. But it is simply incorrect to say that CMS did not adequately consider the implications of its decision. To the contrary, CMS both reasonably explained why this reduction would not cripple the system and considered alternatives to the cutoffs.

In explaining its decision, CMS clarified that its changes were necessary to better "incentivize the adoption of best practices and optimization of donation and organ transplantation rates," 85 Fed. Reg. at 77,913, given the substantial room for improvement among the lowest performing OPOs, *see* 84 Fed. Reg. at 70,644. CMS also explained why it did not expect the

process of decertifying and replacing OPOs to be particularly disruptive to organ procurement and placement in the impacted DSAs. *See* 85 Fed. Reg. at 77,935, 77,940–41. It opined that "almost all OPOs [would] be able to comply with the new tiered standards or [would] arrange a friendly merger with another OPO," and that if an OPO were to be replaced, "the newly responsible OPO would presumably arrange a smooth continuation of services in the DSA through negotiations with the outgoing Board of Directors and CEO to retain existing staff." *Id.* at 77,935.

While the Plaintiffs object that "CMS made no attempt to evaluate the complexities and nuances" of such potential mergers, such as the implications of State Attorney General approval, Pls.' Opp'n 26, an agency need not offer this level of detail in its rulemaking. Indeed, courts "do not require agency explanations to be 'so precise, detailed, or elaborate as to be a model for agency explanation,' and will 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *Finberg v. USDA*, 6 F.4th 1332, 1336 (D.C. Cir. 2021) (first quoting *Fox TV Stations*, 556 U.S. at 538 (Kennedy, J., concurring); and then quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)). And CMS explained that "[e]ven if consolidation were to occur in the industry, [it] believe[d] that the certification process would retain a sufficiently large number of OPOs [] to maintain an adequately diversified market in [the] U.S." 85 Fed. Reg. at 77,913. Though the Plaintiffs may reasonably disagree with this conclusion as well, the Court may "not substitute [its] own judgment for that of the agency." *Wages & White Lion Invs., L.L.C.*, 604 U.S at 567.

As for alternatives, CMS adequately considered those that could reduce the number of decertifications, such as allowing poorly performing OPOs to continue operating under an improvement agreement. *See* 85 Fed. Reg. at 77,912. The record reflects that it fully assessed those options and ultimately adopted the tiered system instead. *Id.* at 77,912, 77,946.

* * *

In closing, the Court notes that the Plaintiffs raise thoughtful disagreements with many of the decisions adopted in the 2020 Rule. But "[u]nder the arbitrary and capricious standard, the scope of judicial review is deferential and narrow." *Am. Hosp. Ass'n v. Azar*, 468 F. Supp. 3d 372, 396 (D.D.C. 2020). On the administrative record before the Court, CMS clearly engaged in the deliberative and iterative process that notice-and-comment rulemaking requires. It considered potential methodologies and data sources, weighed the pros and cons of different thresholds, and responded to commenters' sensible alternatives. The Plaintiffs may reasonably disagree with the agency's conclusions, but that is not a basis for the Court to disturb them.

## CONCLUSION

For the foregoing reasons, the Court denies the Plaintiffs' Motion for Summary Judgment, ECF No. 15, and grants the Defendants' Cross-Motion for Summary Judgment, ECF No. 17.

A separate order will issue.

SPARKLE L. SOOKNANAN
United States District Judge

Date: October 29, 2026